FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
JUN 11 2026
TAMMY H. DOWNS, CLERK
By: DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**FELICIA HAYES** **PLAINTIFF**

**vs.** **Case No. 2:26cv94-BSM**

**THOMAS EVANS; STEVEN ROBERTS; CHRISTOPHER CHAPMOND; and MICHAEL HAGAR** **DEFENDANTS**

---

# COMPLAINT

---

Comes Plaintiff Felicia Hayes, by and through her attorneys, James & Carter, PLC, and for her Complaint against the Defendants, hereby alleges and states that:

## I. INTRODUCTION

1. This civil rights action arises out of the unconstitutional and unlawful arrest of Felicia Hayes ("Plaintiff' or "Ms. Hayes") for Driving While Intoxicated (drugs) without a warrant, without probable cause, and having objective proof exonerating the Plaintiff. Such arrest is the culmination and result of the ASP policy, implemented through training, to prioritize making arrests as a deterrent to the public at large.

2. On July 27, 2024, Trooper Evans ("Trp. Evans") arrested Ms. Hayes, a commercial truck driver, for Driving While Intoxicated ("DWI"), drugs. Based upon ASP policy and training, and based upon comments and pressure from Sgt. Roberts, Trp. Evans made the pre-determined decision to arrest Ms. Hayes before conducting

This case assigned to District Judge Miller
and to Magistrate Judge Ervin

Standard Field Sobriety Tests ("SFST"). Trp. Evans carried out his pre-determined decision to arrest Ms. Hayes after making observations during the SFST that objectively precluded intoxication, based upon his training.

3. Pursuant to Trp. Evans' training, Trp. Evans' observations during the Horizontal Gaze Nystagmus ("HGN") test objectively ruled out intoxication (drugs and alcohol) because he did not observe HGN. Additionally, Ms. Hayes submitted to a preliminary breath test, which demonstrated no alcohol in her system. Ms. Hayes also provided a urine sample, which was ultimately returned nearly nine months later and confirmed what the troopers' training and sobriety tests had already demonstrated—Ms. Hayes was not intoxicated. The toxicology report from the Arkansas State Crime Laboratory ("ASCL Report") is attached as **Exhibit 1**.

4. On April 14, 2025, Ms. Hayes was acquitted of DWI. The docket from the state district court is attached as **Exhibit 2**.

5. Prior to and during his arrest of Ms. Hayes, Trp. Evans ignored his law enforcement training materials on how to perform a proper DWI investigation. Instead, Trp. Evans implemented the ASP policy of specific and general deterrence through vigorous enforcement, and he arrested Ms. Hayes for DWI (drugs) without probable cause.

6. As a result of the arrest, Ms. Hayes' driver's license was suspended for six months, and she was unable to earn a living as a commercial truck driver during that time, which created cascading financial hardships and losses. Ms. Hayes sustained compensatory damages from out-of-pocket expenses, loss of income, and

the loss of other possessions that depended upon her income to maintain. Furthermore, Plaintiff suffered and continues to suffer severe emotional distress from the unlawful arrest, the loss of her ability to earn an income, and the inability engage in her career as a commercial truck driver.

7. This action seeks compensatory and punitive damages resulting from Defendants violations of Ms. Hayes' rights under the United States Constitution and the Arkansas Constitution.

## II. JURISDICTION & VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth and Fourteenth Amendments to the United States Constitution.

9. Jurisdiction is based upon 28 U.S.C. § 1331, 28 U.S.C. § 1343, and U.S.C. § 1367(a). This Court has supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because the claims form part of the same case or controversy as the 42 U.S.C. § 1983 claim.

10. Venue is proper pursuant to 28 U.S.C. § 1391(b) as the acts complained of herein all occurred in Crittenden County, Arkansas, such county being situated in the Delta Division of the Eastern District of Arkansas.

## III. PARTIES

11. Plaintiff Felicia Hayes is, and at all relevant times was, a resident of Hinds County, Mississippi.

12. Defendant Thomas Evans is a resident of Crittenden County, Arkansas. At all relevant times pertinent hereto, Trp. Evans was a law enforcement officer

(trooper) with the Arkansas State Police ("ASP"), acting under the color of state law and within the course and scope of his employment with the ASP. Trp. Evans is sued individually. The claims against Trp. Evans in his official capacity will be made in a separate proceeding before the Arkansas Claims Commission, as is required by the Eleventh Amendment to the U.S. Constitution ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States...").

13. Defendant Steven Roberts ("Sgt. Roberts") is a resident of St. Francis County, Arkansas. At all relevant times pertinent hereto, Sgt. Roberts was an officer with the Arkansas State Police, acting under the color of state law and within the course and scope of his employment with the ASP. Sgt. Roberts is sued individually. The claims against Sgt. Roberts in his official capacity will be made in a separate proceeding before the Arkansas Claims Commission, as is required by the Eleventh Amendment to the U.S. Constitution ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States...").

14. Defendant Christopher Chapmond ("Dir. Chapmond") is a resident of Garland County, Arkansas. At all relevant times pertinent hereto, Dir. Chapmond served as the Director of the Arkansas Commission on Law Enforcement Standards and Training (CLEST). At all relevant times, Dir. Chapmond was acting under the color of state law and within the course and scope of his employment with the ASP. Dir. Chapmond is sued individually. The claims against Dir. Chapmond in his official

capacity will be made in a separate proceeding before the Arkansas Claims Commission, as is required by the Eleventh Amendment to the U.S. Constitution ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States...").

15. Defendant Colonel Michael Hagar ("Col. Hagar") is a resident of St. Faulkner County, Arkansas. At all relevant times pertinent hereto, Col. Hagar was the Director of the Arkansas State Police and the Secretary of the Arkansas Department of Public Safety, and served as the Col. Hagar is the cabinet secretary over the Commission on Law Enforcement Standards and Training. At all relevant times, Col. Hagar was acting under the color of state law and within the course and scope of his employment with the ASP. Col. Hagar is sued individually. The claims against Col. Hagar in his official capacity will be made in a separate proceeding before the Arkansas Claims Commission, as is required by the Eleventh Amendment to the U.S. Constitution ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States...").

16. The above-named Defendants identified in paragraphs 12-15 are collectively referred to herein as "Defendants".

## IV. FACTUAL ALLEGATIONS

17. Plaintiff incorporates by reference all preceding paragraphs of this Complaint.

*Clearly Established Law*

18. On July 27, 2024, it was clearly established "that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Thurairajah v. City of Fort Smith, Arkansas*, 925 F.3rd 979, 984 (8th Cir., 2019)(citations omitted). The continuation of a detention or arrest violates the Fourth Amendment when the law enforcement officer discovers facts dispositive of probable cause. *Nieters v. Holtan*, 83 F.4th 1099, 1108-09 (8th Cir., 2023).

*Policies and Training*

19. The Arkansas State Police has a written policy to "vigorously enforce" DWI offenses. The relevant part of ASP's policy manual is attached as **Exhibit 3**.

20. In training its law enforcement officers, the ASP has adopted the National Highway Traffic Safety Administration's ("NHTSA") "SFST DWI Detection and Standardized Field Sobriety Testing" Instructor Guide and Training Manual. The referenced parts of the Instructor Guide is attached as **Exhibit 4**, and the referenced parts of the Training Manual is attached as **Exhibit 5**. Additionally, the ASP has adopted NHTSA's "Refresher" Instructor Guide and Training Manual. The reference parts of the NHTSA "Refresher" Instructor Guide is attached as **Exhibit 6**, and the referenced parts of the NHTSA "Refresher" Training Manual is attached as **Exhibit 7**.

21. ASP reinforces in its training and training materials that the goal—the "ultimate goal"—is not to enforce the law, but rather to "modify [citizen] behavior" through making arrests. **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual).

22. According to the ASP training materials, "DWI countermeasures that seek a shortcut to the ultimate goal of behavioral change usually are labeled 'deterrence.'" **Id.** During its discussion on "deterrence" the training materials never once reference "probable cause" to justify an arrest.

23. The "key feature of deterrence is it strives to change DWI behavior… through fear of apprehension and application of sanctions." **Id.** "For some, the arrest, with its attendant handcuffing, booking, and publicity, and other stigmatizing and traumatizing features, is the thing most to be feared." "Still others fear most… the license suspension and increased premiums for automobile insurance." **Id.**

24. ASP trains that there are two types of deterrence: specific and general. **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual).

25. Specific deterrence involves some type of punishment. According to the training materials, "[t]he concept of DWI deterrence through fear of apprehension or punishment seems sound." **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual).

26. General deterrence depends on enforcement. "General deterrence of DWI is based on the driving public's fear of being arrested." **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual). "The fear of being caught is a direct function of the number of people who are caught." **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual). "Unless there is a real risk of being arrested, there will not be much fear of arrest." **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual).

27. ASP's "Refresher" training materials reminds troopers that the ultimate goal of the training is to increase deterrence.

28. Media hype, "without intensified enforcement… [is] not enough to maintain the fear of arrest for very long." **Ex. 4** (Instructor Guide; **Ex. 5** (Training Manual). According to the training materials, generally "the number of DWI arrests appears to fall short of what would be required to sustain a public perception [that] there is a significant risk of being caught." **Id**. And, "[n]o specific deterrence program can amount to much unless police officers arrest a large number" of drivers. **Id**.

29. To achieve its goal of instilling fear into the driving public, "law enforcement [officers] must arrest enough violators to convince the public that they will get caught." **Id.**

30. An arrest for DWI is the only offense under the Arkansas criminal code that limits prosecutorial discretion. Under Arkansas law, Ark. Code Ann. § 5-65-107, once a trooper arrests a driver for DWI, the charge cannot be reduced or dismissed, and it must be tried to a judge or jury for a driver to exonerate herself.

*Detention and Arrest*

31. On July 26, 2024, at approximately 11:48 p.m., officers with the West Memphis Police Department ("WMPD") and Trp. Wright with the Arkansas State Police responded to a single-vehicle accident involving a tractor trailer truck driven by Ms. Hayes, a black female.

32. Ms. Hayes was a commercial truck driver with a permit from the United States Department of Transportation Federal Motor Carrier Safety Administration to engage in transportation as a contract carrier of property by motor vehicle in interstate commerce.

vehicle in interstate commerce.

33. Trp. Wright was the first ASP trooper to arrive.

34. When Trp. Wright arrived, WMPD officers were already present and had inquired of Ms. Hayes about what led to the single-vehicle accident.

35. According to the report by WMPD Ofc. Tyler Robinson, Ms. Hayes was traveling north on Dr. Martin Luther King Jr. Drive in West Memphis, Arkansas. For reasons unknown, the rear of the trailer struck the east side guardrail.

36. Sgt. Roberts was the second ASP trooper that arrived on scene.

37. Without any investigation, and without talking to or conducting an observation of Ms. Hayes, Sgt. Roberts' first communication with Trp. Wright progressed as follows:

Sgt. Roberts: "She drinking?"
Trp. Wright: "Not that I can tell. She don't smell like it."
Sgt. Roberts: "What's wrong with her?"
Trp. Wright: "I don't know."
Sgt. Roberts: "How'd she get turned sideways?"

Trp. Wright then explained Ms. Hayes' story to Sgt. Roberts noting that Ms. Hayes was unsure how the circumstance occurred.

38. Trp. Evans was the third Arkansas State Police trooper to arrive.

39. Sgt. Roberts, again without conducting a standard field sobriety test, told Trp. Evans that there's something wrong with Ms. Hayes—that she's taken "something."

40. Trp. Evans asked Trp. Wright if he had conducted any SFSTs yet, and Trp. Wright responded that he had not—that he "think[s] she'll be alright on the

SFSTs."

41. All three troopers then approach Ms. Hayes, and Sgt. Wright asked Ms. Hayes if she has taken Ambien or something to sleep. Ms. Hayes responded, "No sir." Sgt. Roberts immediately followed up by asking Ms. Hayes if she knew where she was, and she correctly responded, "West Memphis."

42. The West Memphis Police officer, who was black, notified the troopers that he was going to simply cite Ms. Hayes for traffic violations. However, the ASP officers, who were white, detained Ms. Hayes to conduct a DWI investigation.

43. Trp. Evans took Ms. Hayes to the front of his vehicle and asked her additional questions about her driving logs and where she was going. Ms. Hayes notified Trp. Evans that she was getting off the interstate to go to Loves gas station and "shut down" for the night.

44. Trp. Evans noted to Trp. Wright that Ms. Hayes' speech was slow and deliberate, but Trp. Evans admitted that he did not know if that was her general demeanor, "if she was always like that."

45. Trp. Evans notified Sgt. Roberts that he (Trp. Evans) did not smell alcohol on Ms. Hayes.

46. Trp. Wright notified Sgt. Roberts that neither he (Trp. Wright) nor Trp. Evans were DRE (Drug Recognition Expert) or ARIDE (Advanced Roadside Impaired Driving Enforcement) certified. Trp. Evans also notified Sgt. Roberts that he (Trp. Evans) was not ARIDE certified. That conversation progressed as follows:

Trp. Evans: "I'm not ARIDE or nothing like that."
Sgt. Roberts: "You don't have to be."
Trp. Evans: "Well I'm, I'm saying. I… You know… What… So, we just do HGN?
Sgt. Roberts: "HGN, Walk and Turn, and One Leg Stand."

As noted in that brief exchange, Sgt. Roberts instructed Trp. Evans to perform the Horizontal Gaze Nystagmus test, the Walk and Turn test, and the One Leg Stand test.

47. Trp. Evans placed Ms. Hayes in the back of his patrol vehicle, and he drove her to a nearby gas station parking lot in order to administer the SFSTs.

48. In his DWI investigation of Ms. Hayes, Trp. Evans asked Ms. Hayes to perform several standard field sobriety tests, which consisted of the Gaze Nystagmus testing, Walk and Turn test, and One Leg Stand test.

*Trp. Evans' Training to Administer SFSTs*

49. Trp. Evans completed his training to become an Arkansas State Police trooper on December 21, 2023.

50. During his training, on December 11, 2023, Trp. Evans completed a four (4) hour refresher course on conducting SFSTs. The name of this course was "Standardized Field Sobriety Testing Refresher Course." *See* **Ex. 7**.

51. Defendant Sgt. Roberts was Trp. Evans' instructor for this course.

52. The criteria and materials for this course were adopted from the National Highway Transportation Safety Administration ("NHTSA").

53. The NHTSA is part of the United States Department of Transportation. The NHTSA training materials and courses are used to train ASP troopers on how to conduct DWI investigations.

54. The instructor guide and training manual materials that were part of Trp. Evans' refresher course in December 2023 provided instruction how to conduct SFSTs, including the Horizontal Gaze Nystagmus test ("HGN") and the Vertical Gaze Nystagmus test ("VGN").

55. The instructor guide and the training manual specifically addressed the circumstance in which a trooper administers both the HGN and VGN tests and the trooper only observes vertical gaze nystagmus, without also observing horizontal gaze nystagmus.

56. According to the NHTSA instructor and training materials, "There is no known drug that will cause VGN without causing at least four clues of HGN." **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual); **Ex. 6** ("Refresher" Instructor Guide); **Ex. 7** ("Refresher" Training Manual). If VGN is present and HGN is not, it could be a medical condition." **Id.**

*Trp. Evans Administers the SFSTs to Ms. Hayes—Objective Observations Precluding Intoxication*

57. The first tests Trp. Evans administered to Ms. Hayes were the HGN and VGN tests.

58. When Trp. Evans performed nystagmus testing on Ms. Hayes, she did not exhibit nystagmus during the HGN portion of the test, and Trp. Evans did not observe nystagmus during the HGN test.

59. In his narrative that Trp. Evans submitted on his arrest of Ms. Hayes, he specifically stated that "Hayes only displayed vertical nystagmus..."

60. Trp. Evans' observations of Ms. Hayes' eyes during the HGN test

objectively ruled out intoxication because, according to Trp. Evans' training materials, "[t]here is no known drug that will cause VGN without causing at least four clues of HGN. If VGN is present and HGN is not, it could be a medical condition."

61. Ms. Hayes was not intoxicated—not by alcohol and not by drugs.

*<u>Trp. Evans Administers the SFSTs to Ms. Hayes—Walk and Turn and One Leg Stand Tests</u>*

62. Despite being able to objectively rule out intoxication—both by alcohol and by drugs—Trp. Evans continued to administer SFSTs to Ms. Hayes.

63. Next, Trp. Evans administered the Walk and Turn test.

64. Pursuant to both the training manual and the participant manual, the Walk and Turn test is "79% accurate at detecting subjects at or above 0.08 BAC [blood alcohol content]." The training materials provide no claim regarding the accuracy of such test to determine whether a person is possibly intoxicated by drugs.

65. The training materials recognize that persons with "back, leg, or inner ear problems have difficulty performing this test." **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual); **Ex. 6** ("Refresher" Instructor Guide); **Ex. 7** ("Refresher" Training Manual).

66. Prior to administering the Walk and Turn test, Ms. Hayes notified Trp. Evans that she had back and hip problems. Trp. Evans noted in his written report that "Hayes stated that she had back and hip issues." Trp. Evans asked Ms. Hayes if she had any issues walking, and she responded that she did have issues walking.

67. Trp. Evans told Ms. hayes that he could skip the Walk and Turn test if Ms. Hayes didn't think she could perform the test, but that he would administer

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**FELICIA HAYES** **PLAINTIFF**

**vs.** **Case No.** 2:26cv94-BSM

**THOMAS EVANS; STEVEN ROBERTS; CHRIS CHAPMOND; and MIKE HAGAR** **DEFENDANTS**

---

**COMPLAINT**

---

# <u>Exhibit 1</u>

## Arkansas State Crime Lab Report

Respectfully submitted,

Matt Stauffer

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*

ARKANSAS STATE CRIME LAB

# Arkansas State Crime Laboratory

3 Natural Resources Drive
Little Rock, Arkansas 72205

## Toxicology
## Report of Laboratory Analysis

ANAB ANSI National Accreditation Board ACCREDITED ISO/IEC 17025 FORENSIC TESTING LABORATORY

**Investigating Officer/Agency/Address:**
Dylan Evans
A.S.P. - Troop D - Forrest City
3205 North Washington
Forrest City, AR 72335

**Laboratory Case Number:**
2024-016904

**Agency Case Number:**
300A2176274

**Suspect(s):**
Felicia Hayes

**Victim(s):**

*I do hereby attest and confirm, as specified by A.C.A § 12-12-313, that the information listed below is a true and accurate report of the results of analysis performed on evidence received in a sealed condition at the Arkansas State Crime Laboratory. The results stated below relate only to the items tested and represent the interpretations/opinions of the undersigned analyst. This is only an official Arkansas State Crime Laboratory report when reproduced in full.*

**Felicia Hayes:**

Urine

Volatile

| | |
|---|---|
| Acetone | not detected |
| Ethanol | not detected |
| Isopropanol | not detected |
| Methanol | not detected |

General Toxicology

No drugs detected (GC-MS)

Note: Reported measurement uncertainties define an interval having a level of confidence of at least 95%. Where a numerical measurement is reported without an accompanying measurement uncertainty, the measurement uncertainty is available upon request.

**Jenna N Hernandez, Forensic Toxicologist**
*Reporting Analyst*
*jenna.hernandez@dps.arkansas.gov*

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**FELICIA HAYES** **PLAINTIFF**

**vs.** **Case No.** 2:26cv94-BSM

**THOMAS EVANS; STEVEN ROBERTS; CHRIS CHAPMOND; and MIKE HAGAR** **DEFENDANTS**

---

**COMPLAINT**

---

# **Exhibit 2**

Docket - Acquittal

Respectfully submitted,

Matt Stauffer

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*

# CRITTENDEN COUNTY DISTRICT COURT, WEST MEMPHIS

**CERTIFIED DOCKET**

Cases as of
05 13/2025 04:15 PM

COUNTY DOCKET

| Case Id | Description | Filing Date |
|---|---|---|
| WMS-24-2184 | STATE V FELICIA DEMETRIA HAYES | 07-28-24 |

CASE TYPE COUNTY DOCKET TRAFFIC/CRIMINAL
CRITTENDEN COUNTY DISTRICT COURT WEST MEMPHIS

| End Date | Party Type | ID | Party Name | Payplan Balance |
|---|---|---|---|---|
| | JUDGE | D21D01 | 21ST STATE DISTRICT COURT JUDGE DIV 1 | |
| | ATTORNEY | AR93140 | ZIEGENHORN BART EDMOND | |
| | DEFENDANT | @3220419 | HAYES FELICIA DEMETRIA | |
| | OFFICER | WMPD296 | ROBINSON TYLER | |
| | OFFICER | ASP178 | EVANS (TRP) DYLAN | |
| | OFFICER | ASP574 | WRIGHT, (TRP) COLLIER | |
| | BAIL BOND COMPANY | 18EXITBB | EXIT BAIL BOND COMPANY INC | |

| Service Documents | Signed | Served? | Date | Event Description | Service Reason |
|---|---|---|---|---|---|

HAYES, FELICIA DEMETRIA — D O B 07-30-68

Address Type: EC Since: 07-28-24
1410 WINCHESTER STREET
JACKSON MS 39211

Address Type: MA Since 07-28-24
1410 WINCHESTER STREET
JACKSON MS 39211

Violation 1 Citation# 300A2176274 Age at Violation 55
27-23-114(a)(1) MB CDL - OPERATING COMMERCIAL MOTOR VEHICLE WHILE INTOXICATED - DWI WITH CDL
Level: CLASS B MISDEMEANOR
Violation Date 07-27-24
Violation Time 01.22 05
$0 00 DWI COURT COSTS
$0 00 FINES GENERAL
$0 00 COUNTY JAIL FINE

Plea 07-29-24 NOT GUILTY
Disp 04-14-25 NOT GUILTY (ACQUIT
Sent SENTENCE
Term 0 Days
Susp Days
DEFENDANT AND ATTORNEY B ZIEGENHORN APPEARED IN COURT DPA K. ROGERS ADVISED NO WITNESS AVAILABLE STATE RESTS. DEFENDANT FOUND NOT GUILTY WMPD: FIREARM MAY BE RELEASED TO DEFENDANT UPON PROOF OF OWNERSHIP.

| Filing Dat | Docket Entry | Filing Party | |
|---|---|---|---|
| 07-28-24 | ELECTRONIC CITATION FILED | | AWCARTHRON 28-JUL-24 |
| 07-28-24 | FILING - OTHER | | AWCARTHRON 07-AUG-24 |
| 07-28-24 | ARREST/DISPOSITION REPORT<br>ARREST REPORT<br>DISPOSITION REPORT | | AWCARTHRON 07-AUG-24 |
| 07-28-24 | REPORT FILED | | AWCARTHRON 07-AUG-24 |
| 07-28-24 | STATEMENT OF RIGHTS | | AWCARTHRON 07-AUG-24 |
| 07-29-24 | ORDER - SCHEDULING ORDER | | AWCARTHRON 07-AUG-24 |
| 07-29-24 | PLEA AND WAIVER | | AWCARTHRON 07-AUG-24 |
| 07-29-24 | PRE-SENTENCE REPORT | | AWCARTHRON 07-AUG-24 |
| 08-07-24 | SURETY BOND | EXIT BAIL BOND COMPANY INC | AWCARTHRON 07-AUG-24 |
| 09-05-24 | MOTION DISCOVERY | ZIEGENHORN BART EDMOND | AWCARTHRON 05-SEP-24 |
| 09-10-24 | SUBPOENA ISSUED | | AWCARTHRON 10-SEP-24 |
| 09-13-24 | SUBPOENA ISSUED<br>SUBPOENA FOR MS DRIVING RECORD | | AWCARTHRON 13-SEP-24 |
| 09-16-24 | ORDER - SCHEDULING ORDER | | AWCARTHRON 24-OCT-24 |
| 10-25-24 | SUBPOENA ISSUED | | AWCARTHRON 25-OCT-24 |

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

**FELICIA HAYES** **PLAINTIFF**

vs. Case No. 2:26cv94-BSM

**THOMAS EVANS; STEVEN ROBERTS; CHRIS CHAPMOND; and MIKE HAGAR** **DEFENDANTS**

---

**COMPLAINT**

---

# Exhibit 3

ASP Policy – Traffic Enforcement/Highway Patrol

Respectfully submitted,

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*

# FOREWORD

I am pleased to present to you the policy and procedures manual for the Arkansas State Police inclusive of the Department of Public Safety Policies. The manual includes the following sections:

- DPS Policies – All Employees of DPS (including all ASP Employees)
- General Manual – All ASP Employees
- Law Enforcement Manual – All Commissioned Personnel (some policies may also apply to certain Civilian Personnel and those policies will require signatures in PowerDMS)
- Civilian Manual – All Civilian Personnel (Commissioned supervisors of Civilian Personnel are responsible for enforcing policies that apply to their subordinates)
- ASP Division and Section Procedures
- ASP Directives and Miscellaneous

This manual will be revised as needed and it will be your responsibility to review and sign for any new policies or procedures. Please consult with your immediate supervisor if you need further direction or clarification of the contents of this manual.

The Arkansas State Police is an agency solidified by the efforts of all of our personnel acting as a team. If you have an idea, suggestion, comment, or concern about a policy, please contact Veronica King at (501) 618-8623 or at veronica.king@asp.arkansas.gov.

Colonel Mike A. Hagar #275
Secretary, Dept. of Public Safety
Director, Arkansas State Police

**Arkansas State Police**
**Policy Manual Checklist**
(Revised 03/07/2025)

## DPS POLICIES

*See* 000 - DPS Policy Manual Table of Contents in PowerDMS.

### ASP General Policies:

| Section | Content | Effective Date | Last Revised Date |
|---|---|---|---|
| 1 | Mission Statement, Vision and Core Values | July 14, 2008 | September 21, 2017 |
| 2 | Duties of the ASP | July 14, 2008 | |
| 3 | Uniforms and Personal Appearance | October 29, 2021 | October 21, 2024 |
| 24 | Residency Requirements | July 14, 2008 | January 24, 2023 |
| 25 | Aircraft Use | July 14, 2008 | |
| 27 | Video Support Unit & Photo Lab | July 14, 2008 | |
| 33 | Radio Communications | July 14, 2008 | December 11, 2015 |
| 34 | Juveniles | July 14, 2008 | |
| 35 | Victim Assistance & Notification | July 14, 2008 | |
| 38 | Identification/Security Cards | October 15, 2014 | |
| 41 | Intranasal Naloxone Program | May 1, 2020 | |

### ASP Law Enforcement Policies:

| Section | Content | Effective Date | Last Revised Date |
|---|---|---|---|
| 1 | Essential Job Functions | July 14, 2008 | May 21, 2024 |
| 3 | Transfers & Promotions | July 14, 2008 | May 21, 2024 |
| 7 | Search & Seizure | July 14, 2008 | |
| 8 | Arrest | July 14, 2008 | |
| 9 | Bias-Free Policing | July 14, 2008 | January 28, 2022 |
| 10 | Use of Force | July 14, 2008 | January 28, 2021 |
| 11 | Reporting & Investigating Use of Force | July 14, 2008 | May 14, 2021 |
| 12 | Use of Conducted Electrical Weapons | July 14, 2008 | May 14, 2021 |
| 13 | Vehicle Pursuits | July 14, 2008 | February 24, 2023 |
| 14 | Prisoners | July 14, 2008 | |
| 15 | Consular Notification | July 14, 2008 | January 6, 2012 |
| 16 | Property & Evidence Control | July 14, 2008 | July 22, 2024 |
| 17 | Admin. Inventory – Persons/Vehicles | July 14, 2008 | |
| 18 | Traffic Enforcement / Highway Patrol | July 14, 2008 | January 6, 2012 |
| 19 | In-Car Cameras & Body Worn Cameras | July 14, 2008 | January 24, 2023 |
| 20 | Vehicle Equipment & Lighting | July 14, 2008 | April 25, 2016 |
| 21 | Swat / CNT | July 14, 2008 | July 13, 2021 |
| 22 | Cyber Crimes | July 14, 2008 | |
| 23 | Canine Deployment | July 14, 2008 | |
| 24 | Flag Courtesy | July 14, 2008 | February 24, 2012 |
| 25 | Firearms | November 17, 2023 | November 4, 2024 |
| 26 | Firearms Inventory | July 14, 2008 | July 15, 2010 |
| 27 | Small Unmanned Aircraft Systems (sUAS) | December 3, 2018 | May 12, 2022 |
| 28 | Automated License Plate Readers | October 12, 2011 | January 15, 2025 |
| 29 | Physical Fitness & Wellness Program | January 1, 2012 | May 21, 2024 |
| 30 | Athletic Events –Security | August 3, 2012 | |
| 31 | Emergency Response Team | December 11, 2015 | April 1, 2019 |
| 32 | PepperBall System | March 2, 2020 | |
| 33 | Long Range Acoustical Device (LRAD) | March 2, 2020 | |

from the Commission on Law Enforcement Standards and Training. Officers should operate radar/lidar consistent with ASP training.

**DWI/DUI Enforcement General Policy:** It is the policy of the ASP to vigorously enforce DWI (alcohol and drugs), DUI (minors), and Commercial Vehicle DWI (alcohol and drugs) offenses in accordance with the provisions of Arkansas law. Officers should be alert for suspected DWI, DUI, and Commercial Vehicle DWI offenders. When an officer believes that a person has operated a motor vehicle while under the influence of alcohol or drugs and in violation of Arkansas law, the officer should follow the procedures set forth in state law.

**Tests for Blood-Alcohol / Drug Test:** The ASP designates the breath, blood, and/or urine tests to be administered to any person in police custody for DWI, DUI, or Commercial Vehicle DWI, or any other legal purpose. These tests will be performed according to Arkansas law and state mandated procedures.

This policy does not preclude officers from requesting any test(s) that may be required to perform their job duties.

**Sobriety Checkpoint Operations:** Sobriety Checkpoints are an effective means of enforcing the laws of the State of Arkansas while ensuring the protection of all motorists.

Sobriety Checkpoints should be conducted as outlined in the Highway Patrol Procedures. When feasible, a supervisor should be on the scene during a Sobriety Checkpoint. However, officers may conduct a Sobriety Checkpoint in the absence of a supervisor provided that a supervisor has given specific permission to do so and is available for consultation. Should the supervisor authorizing the checkpoint not be present, an officer will be designated for the operation of the checkpoint.

ASP personnel may conduct a Sobriety Checkpoint in conjunction with other law enforcement agencies. However, any such joint checkpoint should only be conducted if the cooperating law enforcement officers agree to comply with the specific requirements set forth in this policy and the Highway Patrol Procedures.

The forgoing section pertains to sobriety checkpoints and is not applicable to roadblocks established for other purposes.

**Troop Recordings:** All communication centers are equipped with radio and telephone recording equipment. Access to the communication center is generally limited to those

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**FELICIA HAYES** **PLAINTIFF**

**vs.** **Case No.** 2:26cv94-BSM

**THOMAS EVANS; STEVEN ROBERTS; CHRIS CHAPMOND; and MIKE HAGAR** **DEFENDANTS**

---

**COMPLAINT**

---

# Exhibit 4

NHTSA Instructor Guide

Respectfully submitted,

Matt Stauffer

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*

# SFST

DWI Detection and Standardized Field Sobriety Testing

# INSTRUCTOR GUIDE

## B. Concept of General Deterrence




**Slide 15.**

The fear of arrest is the leading deterrent. One approach to reducing the number of drinking drivers is general deterrence of DWI. General deterrence of DWI is based in the driving public's fear of being arrested. If enough violators come to believe there is a good chance they will get caught, at least some of them will stop committing DWI at least some of the time. However, unless there is a real risk of arrest, there will not be much fear of arrest.

Law enforcement officers must arrest enough violators enough of the time to convince the general public they will get caught, sooner or later, if they continue to drive while impaired.

Instructor Note

***Pose this question: "How do we convince the public there is a good chance of being arrested for DWI?"***

***Guide the discussion to bring out the fact an appreciable number of violators must be arrested if others are to believe there is a real risk they will be arrested.***

How many DWI violators must be arrested in order to convince the public there is a real risk of arrest for DWI?

Instructor Note

***Pose this question: "Are we presently arresting enough violators in this State to convince them there is a real risk of being caught?"***

Several programs have demonstrated significant deterrence can be achieved by arresting 1 DWI violator for every 100 DWI violations committed. Currently, however, for every DWI violator arrested, there are between 500 and 2,000 DWI violations committed.




**Slide 16.**

Instructor Note

***According to the Center for Disease Control (CDC), US adults admitted to drinking too much and getting behind the wheel 111 million times in 2014.***

***If the chances of being arrested are minimal, do you believe the average DWI offender will fear arrest?***

***Draw the analogy – compare with housebreaking a puppy by punishing the puppy once only every 100 times it messes on the carpet.***

When the chances of being arrested are 1 in 100, the average DWI violator really has little to fear.

Instructor Note

***Why is the DWI arrest to violations ratio (1:100) so low?***

There are three noteworthy reasons: (1) DWI violators vastly outnumber police officers - It is not possible to arrest every drinking driver each time they commit DWI; (2) Some officers are not highly skilled at DWI detection - They fail to recognize and arrest many DWI violators; and, (3) Some officers are not motivated to detect and arrest DWI violators.




**Slide 17.**

Significant Findings: In a 1975 study conducted in Fort Lauderdale, Florida, only 22% of traffic violators who were stopped with BACs between 0.10 and 0.20 were arrested for DWI. The remainder were cited for other violations, even though they were legally impaired. In this study, breath tests were administered to the violators by researchers after the police officers had completed their investigations. The officers failed to detect 78% of the DWI violators they investigated.

Instructor Note

***Source:***

(1976, December). *Selective Traffic Enforcement Program – STEP-BAC (Blood Alcohol Content) in Fort Lauderdale, Florida.* (Report No. DOT HS 801 956), Fort Lauderdale, FL.

***In the Fort Lauderdale study, breath tests were administered to traffic violators by research staff members, after police officers had completed their investigations of the violators. Officers failed to detect 78% of the DWI violators they investigated.***




Slide 18.

Implication: For every DWI violator actually arrested, three others are contacted by police officers, face to face, but are released without arrest. Significant improvement in arrest rate could be achieved if officers were more skilled at DWI detection.

Instructor Note

***Point out this study was the reason for NHTSA developing this course. This study demonstrated the need for SFST training.***

***Source:***

Hause, J., Matheson, D., Hannon, R., & Chavez, E. (1977, January). *Increased D.U.I. Enforcement Program: Stockton, California Project Evaluation.* (Contract No. DOT-HS-5-01194). U.S. Department of Transportation/National Highway Traffic Safety Administration.




What must the comprehensive community based DWI programs seek to accomplish? Ultimately, nothing less than fundamental behavioral change on a widespread basis. This goal is achieved by encouraging more Americans to avoid committing DWI either by avoiding or controlling drinking prior to driving or by selecting alternative transportation. Ride sharing services (for example, Uber and Lyft) are becoming increasingly popular as an alternative transportation. The goal is also achieved by intervene actively to prevent others from committing DWI (for example, putting into practice the theme "friends don't let friends drive drunk") and avoiding riding with drivers who are impaired.

The final test of the value of DWI countermeasures on the National, State, and local levels is whether they succeed in getting significantly more people to modify their behavior. The programs also pursue other more immediate objectives that support or reinforce the ultimate goal. However, the ultimate goal is to change driving while impaired to an unacceptable form of behavior at all levels.




How can we bring about these changes in behavior? How can we discourage impaired driving, prevent others from drinking and driving, and avoid becoming passive "statistics" by refusing to ride with drinking drivers? Basically, there are two general approaches that must be taken to achieve this goal. One: prevention -- gives promise of the ultimate, lasting solution to the DWI problem; but it will require a substantial amount of time to mature fully. Two: deterrence -- only offers a partial or limited solution, but it is available right now.




Prevention is the ultimate solution. DWI countermeasures that strive for the ultimate achievement of drinking and driving behavioral changes have been grouped under the label "prevention." There are many kinds of DWI preventive activities. Some are carried out by and in our schools, some through the mass media, some through concerned civic groups, and so forth. The various preventive efforts focus on different specific behaviors and address different target groups. However, they seek to change drinking and driving behavior by promoting more

positive attitudes and by fostering a set of values that reflects individual responsibilities toward drinking and driving.

Preventive countermeasures seek society's acceptance of the fact that DWI is wrong. Some people believe drinking and driving is strictly an individual's personal business; it is up to each person to decide whether or not to accept the risk of driving after drinking. Preventive activities try to dispel that outmoded and irresponsible belief. Instead, they promote the idea no one has the right to endanger others by drinking and driving, or to risk becoming a burden (economically and otherwise) to others as a result of injuries suffered while drinking and driving. Realistically, everyone has an obligation not only to control their own drinking and driving, but also to speak up when others are about to commit the violation. Only when all of society views DWI as a negative behavior that cannot be tolerated or condoned, will the public's behavior begin to change. That is the long-term solution.



Slide 22.

General deterrence of DWI is based on the driving public's fear of being arrested. If enough violators come to believe there is a good chance they will get caught, some of them (at least) will stop committing DWI at least some of the time.

Instructor Note

***Pose this question to class: "How do we convince the public there is a good chance of being arrested for DWI?"***

***Gently guide the discussion to bring out the fact an appreciable number of violators must be arrested if others are to believe there is a real risk they will be arrested.***

Unless there is a real risk of being arrested, there will not be much fear of arrest. Law enforcement must arrest enough violators to convince the public they will get caught if they continue to drive while impaired.

C. Relating Detection to Deterrence Potential




Slide 23.

DWI countermeasures that seek a shortcut to the ultimate goal of behavioral change usually are labeled “deterrence." Deterrence can be described as negative reinforcement. Some deterrence countermeasures focus primarily on changing individual drinking and driving behavior while others seek to influence people to intervene into others' drinking and driving decisions.

The key feature of deterrence is it strives to change DWI behavior without dealing directly with the prevailing attitudes about the rightness or wrongness of DWI. Deterrence uses a mechanism quite distinct from attitudinal change: fear of apprehension and application of sanctions.




Large scale DWI deterrence programs try to control the DWI behavior of the driving public by appealing to the public's presumed fear of being caught. Most actual or potential DWI violators view the prospect of being arrested with extreme distaste. For some, the arrest, with its attendant handcuffing, booking, publicity, and other stigmatizing and traumatizing features, is the thing most to be feared.

For others, it is the prospective punishment (jail, stiff fine, etc.) that causes most of the concern. Still others fear most the long-term costs and inconvenience of a DWI arrest: the license suspension and increased premiums for automobile insurance. For many violators, the fear probably is a combination of all of these. Regardless, if enough violators are sufficiently fearful of a DWI arrest, some of them will avoid committing the violation at least some of the time. Fear by itself will not change their attitudes; if they do not see anything inherently wrong with drinking and driving in the first place, the prospect of arrest and punishment will not help them come to this realization. However, fear sometimes can be enough to keep them from putting their anti-social attitudes into practice. This type of DWI deterrence, based on the fear of being caught, is commonly called general deterrence. It applies to the driving public generally and presumably affects the behavior of those who have never been caught. There is an element of fear of the unknown at work here.




Slide 25.

Another type of DWI deterrence, called specific deterrence, applies to those who have been caught and arrested. The typical specific deterrent involves some type of punishment, perhaps a fine, involuntary community service, a jail term, or action against the driver's license. The punishment is imposed in the hope it will convince the specific violator there is indeed something to fear as a result of being caught and to emphasize if there is a next time, the punishment will be even more severe. It is the fear of the known that comes into play in this case. The concept of DWI deterrence through fear of apprehension or punishment seems sound. But will it work in actual practice? The crux of the problem is this: If the motoring public is to fear arrest and punishment for DWI, they must perceive there is an appreciable risk of being caught and convicted if they commit the crime. If actual and potential DWI violators come to believe the chance of being arrested is minimal, they will quickly lose whatever fear of arrest they may have felt.

Enforcement is the mechanism for creating and sustaining a fear of being caught for DWI. No specific deterrence program can amount to much unless police officers arrest large numbers of violators; no punishment or rehabilitation program can affect behavior on a large scale unless it is applied to many people. General deterrence depends on enforcement -- the fear of being caught is a direct function of the number of people who are caught.




Obviously, the police alone cannot do the job. Legislators must supply laws the police can enforce. Prosecutors must vigorously prosecute DWI violators and the judiciary must adjudicate fairly and deliver the punishments prescribed by law. The media must publicize the enforcement effort and communicate the fact the risk is not worth the probable outcome. Each of these elements plays a supportive role in DWI deterrence.




Instructor Note

***Ask the following questions and solicit responses:***

***Question #1: How many DWI violators do we have to arrest in order to convince an appreciable portion of them there is a real risk they will be arrested?***

***Question #2: Are we presently arresting enough violators in this State to convince them there is a real risk of being caught?***

Estimates from around the country vary. For every DWI violator arrested, there are approximately 100 undetected DWI violations. According to the CDC (2014), there were 111 million incidents of DWI per year. According to the FBI UCR, 1.08 million DWI arrests were made in 2015, which means law enforcement arrested approximately one out of every 100 DWI episodes.




Slide 28.

Instructor Note

***Question #3: If the chances of being arrested are 1 in 100, do you believe the average DWI violator will fear arrest?***

The question now is, are violators afraid of being caught? More importantly, should they be afraid? Is there really an appreciable risk of being arrested if one commits DWI? The answer to all of these questions unfortunately is probably not. In most jurisdictions, the number of DWI arrests appears to fall short of what would be required to sustain a public perception there is a significant risk of being caught. Sometimes, it is possible to enhance the perceived risk, at least for a while, through intensive publicity. However, media "hype" without intensified enforcement has never been enough to maintain the fear of arrest for very long.




Slide 29.

Instructor Note

***Question Number 4: Why is the DWI arrest to violation ratio so low?***

***Gently guide the discussion to bring out two possibilities:***

- ***DWI violators vastly outnumber police officers***
- ***Some officers are not well trained in DWI detection***

If an arrest/violation ratio of 1 in 100 is not enough to make deterrence work, is it then reasonable to think we can ever make deterrence work? After all, if we doubled DWI arrests to 1 in 50, we would still be missing 49 violators for every one we managed to catch. If we increased arrests tenfold, to 1 in 10, 9 would escape for everyone arrested. How much deterrence would that produce? Surprisingly, it would probably produce quite a bit. We don't have to arrest every DWI offender every time in order to convince them they have something to fear. We only have to arrest enough of them, enough of the time. As the arrest rate increases, the odds are it will happen to them eventually. The law of averages (or cumulative probability) will catch up with them and sooner than we might at first expect.

D. Evidence of Effective Detection and Effective Deterrence



Slide 30.

Is there any evidence a practical and realistic increase in DWI enforcement activity will induce a significant degree of general deterrence and a corresponding change in DWI behavior? Yes, there is.



Slide 31.

Several enforcement programs have succeeded in achieving significant DWI deterrence. Consider, for example, the three-year intensive weekend DWI enforcement program in Stockton, California. As early as 1975, a study showed the city's total number of DWI arrests (700) were considerably less than one percent of the areas licensed number of drivers (130,000). The implication here was Stockton police were only maintaining the arrest/violation ration of 1:2,000, or less. In addition, roadside surveys on Friday and Saturday nights disclosed nine percent of the drivers were operating with BAC's of 0.10 or higher. Then things changed.

Beginning in 1976, and continuing at planned intervals through the first half of 1979, Stockton police conducted intensive DWI enforcement on weekend nights.

The officers involved were extensively trained. The enforcement effort was heavily publicized and additional equipment (PBTs and cassette recorders) was made available. The police effort was closely coordinated with the District Attorney's office, the County Probation office, and other allied criminal justice and safety organizations.




**Slide 32.**

All this paid off. By the time the project came to a close (in 1979), DWI arrests had increased by over 500%, weekend nighttime collisions had decreased by 34%, and the number of operators committing DWI dropped one third.

The implication of the Fort Lauderdale study, and of other similar studies, was for every DWI violator actually arrested for DWI, three others were contacted by police officers but were not arrested for DWI. From the Stockton study, it is clear significant improvement in the arrest rate could be achieved if officers were more skilled at DWI detection.

*Instructor Note*

***What did Stockton do to contribute to their success?***

***Answers: Increase training, targeted enforcement efforts, coordination with other law enforcement agencies, and media blitz***




Slide 33.

Improved DWI detection can be achieved in virtually every jurisdiction in the country. The keys to success are police officers who are: Skilled at DWI detection; Willing to arrest every DWI violator who is detected; and, Supported by their agencies in all aspects of this program from policy through practical application.

Since the historical Stockton study, numerous States have conducted similar studies to determine the degree of effect DWI arrests would have on alcohol-related fatalities in general and total fatalities in particular. Most of these studies were conducted between 1978 and 1986.

The results of these studies graphically illustrated in each State when the number of arrests for DWI increased the percentage of alcohol-related fatalities decreased. Further, the results of a study conducted in Florida from 1981-1983 showed when DWI arrests per licensed driver increased total fatalities decreased (12-month moving average).




Slide 34.

It is important to understand how increased DWI enforcement can affect deterrence. Deterrence can vastly exceed the level of enforcement officers achieve on any given night. Weekend DWI arrests can increase by as much as 500%, as in the Stockton study.




Slide 35.

Instructor Note

***Point out this level of deterrence was achieved with an arrest/violation ratio of about 1 in 100. Increased skills coupled with increased efforts resulted in more arrests and less crashes.***

The law of averages quickly starts to catch up with DWI drivers. Unless violators change their behavior, many of them will be caught or at least will have known someone who has been arrested. Coupled with the heavy publicity given to the enforcement effort, those experiences were enough to raise the perception level of apprehension among DWI operators that sooner or later they would be caught. As a result, many of them changed their behavior. This is the

best example of general deterrence. In addition, during the same time DWI arrests went up over 500% in Stockton, citations for other traffic violations increased by a comparatively modest 99%. The implication is Stockton's officers were stopping and contacting only twice as many possible violators as they had before, but they were coming up with more than five times as many arrests.




Slide 36.

What have the results of these studies shown? Basically, they have shown a community will benefit from their officers' increased skills at DWI detection. Principally, because of their special training, the officers were better able to recognize "cues" of impairment when they observed vehicles in motion, and they were more familiar with the "clues" or human indicators of impairment exhibited by violators during personal contact. The officers also had more confidence in the field sobriety tests they used to investigate their suspects. The most important factor was far fewer of the violators being stopped now avoided detection and arrest. The difficulty in detecting DWI among operators personally contacted by untrained officers has been well documented. Analysis of roadside survey and arrest data suggest for every DWI violator arrested, three others actually have face-to-face contact with police officers but are allowed to go without arrest. Direct support of that inference was found in the Fort Lauderdale BAC study where researchers demonstrated police officers arrested only 22% of the DWI operators they contacted whose BAC levels were subsequently shown to be between 0.10 and 0.20.




Slide 37.

The ability to <u>detect</u> DWI violators is the key to general deterrence and possibly the greatest impediment to it. If we accept the three to one ratio of <u>failed detections</u> as being reasonably accurate, the implications are rather alarming. Consider the impact on a DWI violator's subsequent behavior when, after being stopped by the police, the operator is allowed to continue driving. Very likely, these DWI violators and their friends will become even more convinced of their ability to handle drinking and driving. Further, they will come to believe they will never be arrested because police officers can't determine when they are "over the limit." Instead of creating general DWI deterrence, this attitude breeds <u>specific reinforcement</u>. This helps to develop a feeling among DWI violators they have nothing more to fear from police than an occasional ticket for a minor traffic offense. On the positive side, the ratio of undetected to detected violations suggests much can be accomplished with <u>existing resources</u> if we use those resources as efficiently as possible. By just being able to improve detection skills of law enforcement officers, we could experience an increase in the arrest/violation ratio without any increase in contacts. This same, or better, degree of effectiveness can happen here.

Instructor Note

***Point out the keys to success are better training in detection skills and willingness to arrest every DWI violator who is detected.***

***Solicit participants' questions concerning general deterrence.***




Slide 23.

Vertical Gaze Nystagmus is an involuntary jerking of the eyes (up and down) which occurs when the eyes gaze upward at maximum elevation. The presence of this type of nystagmus is associated with high doses of alcohol for that individual. It may also be present with certain other drugs. The drugs that cause VGN are the same ones that cause HGN. There is no known drug that will cause VGN without causing at least four clues of HGN. If VGN is present and HGN is not, it could be a medical condition. For VGN to be recorded, it must be distinct and sustained for a minimum of four seconds at maximum elevation.




Slide 24.

Resting Nystagmus is referred to as a jerking of the eyes as they look straight ahead. Its presence usually indicates a medical condition or high doses of a Dissociative Anesthetic drug.

For VGN to be recorded, it must be distinct and sustained for a minimum of four seconds at maximum elevation. VGN may be present in subjects under the influence of high doses of alcohol for that individual, and some other drugs.

## E. E. Walk and Turn




Slide 50.

*Test Stages*: Like all divided attention tests, WAT has two stages. They are: Instruction stage and Walking stage. Both stages are important because they can affect the subject's overall performance on the test.

*Test Conditions*: Whenever possible, the WAT test should be conducted on a reasonably dry, hard, level, non-slippery surface. There should be sufficient room for subjects to complete nine heel-to-toe steps. Field validation studies have indicated varying environmental conditions have not affected a subject's ability to perform this test. Standardizing this test for every type of road condition is unrealistic. The original research study recommended this test be performed on a dry, hard, level, non-slippery surface and relatively safe conditions. If not, the research recommends: 1) subject be asked to perform the test elsewhere, or 2) only HGN be administered.

The original SCRI studies suggested individuals over 65 years of age or people with back, leg, or inner ear problems had difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age. Also, the SCRI studies suggest individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes. Officers should consider all factors when conducting SFSTs.

***Choose a participant to serve as a demonstration subject. Conduct a complete test of the participant subject, carefully carrying out all of the administrative procedures. Refer to the WAT administrative procedures in the Participant Manual. Have the participant subject actually perform the walking stage of the test.***

***Discuss the participant subject's performance in terms of the test recording factors. Refer to the WAT clues in the Participant Manual. If time permits, conduct another demonstration using another participant subject.***

***Have the participants divide into pairs and practice the WAT Test.***

F. One Leg Stand




Slide 59.

***Remind participants prior to administering this test to check if the subject has any physical problems or disabilities.***

Like all divided attention tests, OLS has two stages. They are: Instruction stage and Balance and Counting stage. Both stages are important because they can affect the subject's overall performance on the test.

*Test Conditions:* Whenever possible, the OLS test should be conducted on a reasonably dry, hard, level, and non-slippery surface. Subject's safety should be considered at all times. Standardizing this test for every type of road condition is unrealistic. The original research study recommended this test be performed on a dry, hard, level, non-slippery surface and relatively safe conditions. If not, the research recommends: 1) subject be asked to perform the test elsewhere; or 2) only HGN be administered. However, field validation studies have indicated that varying environmental conditions have not affected a subject’s ability to perform this test.

The original SCRI studies suggested individuals over 65 years of age, people with back, leg or inner ear problems, or people who are overweight by 50 or more pounds may have difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age.

There was no data containing the weight of the test subjects included in the final report. Also, the SCRI studies suggest individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes.

***Stress to participants to consider age and excessive weight along with environmental factors, location, injury, or physical ailments while administering this test. The importance of the totality of all factors should not be overlooked.***

***Point out subjects with any form of any unusual footwear (i.e., flip flops, platform shoes, etc.) should be afforded the opportunity to remove that footwear prior to the test.***

Observe the subject from a safe distance. Although not part of the administrative procedures, if the subject puts the foot down, give instructions to pick the foot up again and continue counting from the point at which the foot touched the ground.



Slide 62.

You may observe a number of different behaviors when a subject performs this test. The original research found the behaviors listed below are the most likely to be observed in someone with a BAC at or above 0.08. When administering the OLS test, we look for certain specific behaviors. Each behavior or action is considered one clue. There is a maximum number of 4 clues on this test. Look for the following clues each time the OLS test is administered.

<u>The subject sways while balancing</u> – This refers to side to side or back and forth motion of the body, or a swaying motion of the foot, while the subject maintains the OLS position.

Instructor Note

***Emphasize swaying means a distinct, noticeable side to side or front to back movement of the elevated foot or of the subject's body.***

Slight tremors of the foot or body should not be interpreted as swaying.

Instructor Note

***Demonstrate swaying.***

<u>Uses arm(s) to balance</u> – Subject moves one or both arm(s) 6 or more inches from the side of the body in order to keep balance.

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**FELICIA HAYES** **PLAINTIFF**

**vs.** **Case No. 2:26cv94-BSM**

**THOMAS EVANS; STEVEN ROBERTS; CHRIS CHAPMOND; and MIKE HAGAR** **DEFENDANTS**

---

**COMPLAINT**

---

# Exhibit 5

NHTSA Training Manual

Respectfully submitted,

Matt Stauffer

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*

# SFST

DWI Detection and Standardized Field Sobriety Testing

# PARTICIPANT MANUAL

NHTSA

TSI

B. Concept of General Deterrence




**Slide 15.**

The fear of arrest is the leading deterrent. One approach to reducing the number of drinking drivers is general deterrence of DWI. General deterrence of DWI is based in the driving public's fear of being arrested. If enough violators come to believe there is a good chance they will get caught, at least some of them will stop committing DWI at least some of the time. However, unless there is a real risk of arrest, there will not be much fear of arrest.

Law enforcement officers must arrest enough violators enough of the time to convince the general public they will get caught, sooner or later, if they continue to drive while impaired.

How many DWI violators must be arrested in order to convince the public there is a real risk of arrest for DWI?

Several programs have demonstrated significant deterrence can be achieved by arresting 1 DWI violator for every 100 DWI violations committed. Currently, however, for every DWI violator arrested, there are between 500 and 2,000 DWI violations committed.




When the chances of being arrested are 1 in 100, the average DWI violator really has little to fear.

There are three noteworthy reasons: (1) DWI violators vastly outnumber police officers - It is not possible to arrest every drinking driver each time they commit DWI; (2) Some officers are not highly skilled at DWI detection - They fail to recognize and arrest many DWI violators; and, (3) Some officers are not motivated to detect and arrest DWI violators.




Slide 17.

Significant Findings: In a 1975 study conducted in Fort Lauderdale, Florida, only 22% of traffic violators who were stopped with BACs between 0.10 and 0.20 were arrested for DWI. The remainder were cited for other violations, even though they were legally impaired. In this study, breath tests were administered to the violators by researchers after the police officers had completed their investigations. The officers failed to detect 78% of the DWI violators they investigated.

***Source:***

(1976, December). *Selective Traffic Enforcement Program – STEP-BAC (Blood Alcohol Content) in Fort Lauderdale, Florida.* (Report No. DOT HS 801 956), Fort Lauderdale, FL.



Slide 18.

Implication: For every DWI violator actually arrested, three others are contacted by police officers, face to face, but are released without arrest. Significant improvement in arrest rate could be achieved if officers were more skilled at DWI detection.

***Source:***

Hause, J., Matheson, D., Hannon, R., & Chavez, E. (1977, January). *Increased D.U.I. Enforcement Program: Stockton, California Project Evaluation.* (Contract No. DOT-HS-5-01194). U.S. Department of Transportation/National Highway Traffic Safety Administration.



Slide 19.

What must the comprehensive community based DWI programs seek to accomplish? Ultimately, nothing less than fundamental behavioral change on a widespread basis. This goal is achieved by encouraging more Americans to avoid committing DWI either by avoiding or controlling drinking prior to driving or by selecting alternative transportation. Ride sharing services (for example, Uber and Lyft) are becoming increasingly popular as an alternative transportation. The goal is also achieved by intervene actively to prevent others from committing DWI (for example, putting into practice the theme "friends don't let friends drive drunk") and avoiding riding with drivers who are impaired.

The final test of the value of DWI countermeasures on the National, State, and local levels is whether they succeed in getting significantly more people to modify their behavior. The programs also pursue other more immediate objectives that support or reinforce the ultimate goal. However, the ultimate goal is to change driving while impaired to an unacceptable form of behavior at all levels.



Slide 20.

How can we bring about these changes in behavior? How can we discourage impaired driving, prevent others from drinking and driving, and avoid becoming passive "statistics" by refusing to ride with drinking drivers? Basically, there are two general approaches that must be taken to achieve this goal. One: prevention -- gives promise of the ultimate, lasting solution to the DWI problem; but it will require a substantial amount of time to mature fully. Two: deterrence -- only offers a partial or limited solution, but it is available right now.



Slide 21.

Prevention is the ultimate solution. DWI countermeasures that strive for the ultimate achievement of drinking and driving behavioral changes have been grouped under the label “prevention." There are many kinds of DWI preventive activities. Some are carried out by and in our schools, some through the mass media, some through concerned civic groups, and so forth. The various preventive efforts focus on different specific behaviors and address different target groups. However, they seek to change drinking and driving behavior by promoting more

positive attitudes and by fostering a set of values that reflects individual responsibilities toward drinking and driving.

Preventive countermeasures seek society's acceptance of the fact that DWI is wrong. Some people believe drinking and driving is strictly an individual's personal business; it is up to each person to decide whether or not to accept the risk of driving after drinking. Preventive activities try to dispel that outmoded and irresponsible belief. Instead, they promote the idea no one has the right to endanger others by drinking and driving, or to risk becoming a burden (economically and otherwise) to others as a result of injuries suffered while drinking and driving. Realistically, everyone has an obligation not only to control their own drinking and driving, but also to speak up when others are about to commit the violation. Only when all of society views DWI as a negative behavior that cannot be tolerated or condoned, will the public's behavior begin to change. That is the long-term solution.




Slide 22.

General deterrence of DWI is based on the driving public's fear of being arrested. If enough violators come to believe there is a good chance they will get caught, some of them (at least) will stop committing DWI at least some of the time.

Unless there is a real risk of being arrested, there will not be much fear of arrest. Law enforcement must arrest enough violators to convince the public they will get caught if they continue to drive while impaired.

## C. Relating Detection to Deterrence Potential




**Slide 23.**

DWI countermeasures that seek a shortcut to the ultimate goal of behavioral change usually are labeled "deterrence." Deterrence can be described as negative reinforcement. Some deterrence countermeasures focus primarily on changing individual drinking and driving behavior while others seek to influence people to intervene into others' drinking and driving decisions.

The key feature of deterrence is it strives to change DWI behavior without dealing directly with the prevailing attitudes about the rightness or wrongness of DWI. Deterrence uses a mechanism quite distinct from attitudinal change: fear of apprehension and application of sanctions.




**Slide 24.**

Large scale DWI deterrence programs try to control the DWI behavior of the driving public by appealing to the public's presumed fear of being caught. Most actual or potential DWI violators view the prospect of being arrested with extreme distaste. For some, the arrest, with its attendant handcuffing, booking, publicity, and other stigmatizing and traumatizing features, is the thing most to be feared.

For others, it is the prospective punishment (jail, stiff fine, etc.) that causes most of the concern. Still others fear most the long-term costs and inconvenience of a DWI arrest: the license suspension and increased premiums for automobile insurance. For many violators, the fear probably is a combination of all of these. Regardless, if enough violators are sufficiently fearful of a DWI arrest, some of them will avoid committing the violation at least some of the time. Fear by itself will not change their attitudes; if they do not see anything inherently wrong with drinking and driving in the first place, the prospect of arrest and punishment will not help them come to this realization. However, fear sometimes can be enough to keep them from putting their anti-social attitudes into practice. This type of DWI deterrence, based on the fear of being caught, is commonly called general deterrence. It applies to the driving public generally and presumably affects the behavior of those who have never been caught. There is an element of fear of the unknown at work here.

## Specific Deterrence



- Caught and arrested
- Public must perceive appreciable risk of being caught and convicted
- Enforcement creates and sustains fear of being caught

DWI DETECTION & SFST

**Slide 25.**

Another type of DWI deterrence, called specific deterrence, applies to those who have been caught and arrested. The typical specific deterrent involves some type of punishment, perhaps a fine, involuntary community service, a jail term, or action against the driver's license. The punishment is imposed in the hope it will convince the specific violator there is indeed something to fear as a result of being caught and to emphasize if there is a next time, the punishment will be even more severe. It is the fear of the known that comes into play in this case. The concept of DWI deterrence through fear of apprehension or punishment seems sound. But will it work in actual practice? The crux of the problem is this: If the motoring public is to fear arrest and punishment for DWI, they must perceive there is an appreciable risk of being caught and convicted if they commit the crime. If actual and potential DWI violators come to believe the chance of being arrested is minimal, they will quickly lose whatever fear of arrest they may have felt.

Enforcement is the mechanism for creating and sustaining a fear of being caught for DWI. No specific deterrence program can amount to much unless police officers arrest large numbers of violators; no punishment or rehabilitation program can affect behavior on a large scale unless it is applied to many people. General deterrence depends on enforcement -- the fear of being caught is a direct function of the number of people who are caught.




Obviously, the police alone cannot do the job. Legislators must supply laws the police can enforce. Prosecutors must vigorously prosecute DWI violators and the judiciary must adjudicate fairly and deliver the punishments prescribed by law. The media must publicize the enforcement effort and communicate the fact the risk is not worth the probable outcome. Each of these elements plays a supportive role in DWI deterrence.




Estimates from around the country vary. For every DWI violator arrested, there are approximately 100 undetected DWI violations. According to the CDC (2014), there were 111 million incidents of DWI per year. According to the FBI UCR, 1.08 million DWI arrests were made in 2015, which means law enforcement arrested approximately one out of every 100 DWI episodes.




Slide 28.

The question now is, are violators afraid of being caught? More importantly, should they be afraid? Is there really an appreciable risk of being arrested if one commits DWI? The answer to all of these questions unfortunately is probably not. In most jurisdictions, the number of DWI arrests appears to fall short of what would be required to sustain a public perception there is a significant risk of being caught. Sometimes, it is possible to enhance the perceived risk, at least for a while, through intensive publicity. However, media "hype" without intensified enforcement has never been enough to maintain the fear of arrest for very long.




Slide 29.

If an arrest/violation ratio of 1 in 100 is not enough to make deterrence work, is it then reasonable to think we can ever make deterrence work? After all, if we doubled DWI arrests to 1 in 50, we would still be missing 49 violators for every one we managed to catch. If we increased arrests tenfold, to 1 in 10, 9 would escape for everyone arrested. How much deterrence would that produce? Surprisingly, it would probably produce quite a bit. We don't have to arrest every DWI offender every time in order to convince them they have something to fear. We only have to arrest enough of them, enough of the time. As the arrest rate increases, the odds are it will happen to them eventually. The law of averages (or cumulative probability) will catch up with them and sooner than we might at first expect.

D. Evidence of Effective Detection and Effective Deterrence




Slide 30.

Is there any evidence a practical and realistic increase in DWI enforcement activity will induce a significant degree of general deterrence and a corresponding change in DWI behavior? Yes, there is.




Slide 31.

Several enforcement programs have succeeded in achieving significant DWI deterrence. Consider, for example, the three-year intensive weekend DWI enforcement program in Stockton, California. As early as 1975, a study showed the city's total number of DWI arrests (700) were considerably less than one percent of the areas licensed number of drivers (130,000). The implication here was Stockton police were only maintaining the arrest/violation ration of 1:2,000, or less. In addition, roadside surveys on Friday and Saturday nights disclosed nine percent of the drivers were operating with BAC's of 0.10 or higher. Then things changed.

Beginning in 1976, and continuing at planned intervals through the first half of 1979, Stockton police conducted intensive DWI enforcement on weekend nights.

The officers involved were extensively trained. The enforcement effort was heavily publicized and additional equipment (PBTs and cassette recorders) was made available. The police effort was closely coordinated with the District Attorney's office, the County Probation office, and other allied criminal justice and safety organizations.




Slide 32.

All this paid off. By the time the project came to a close (in 1979), DWI arrests had increased by over 500%, weekend nighttime collisions had decreased by 34%, and the number of operators committing DWI dropped one third.

The implication of the Fort Lauderdale study, and of other similar studies, was for every DWI violator actually arrested for DWI, three others were contacted by police officers but were not arrested for DWI. From the Stockton study, it is clear significant improvement in the arrest rate could be achieved if officers were more skilled at DWI detection.




Slide 33.

Improved DWI detection can be achieved in virtually every jurisdiction in the country. The keys to success are police officers who are: Skilled at DWI detection; Willing to arrest every DWI violator who is detected; and, Supported by their agencies in all aspects of this program from policy through practical application.

Since the historical Stockton study, numerous States have conducted similar studies to determine the degree of effect DWI arrests would have on alcohol-related fatalities in general and total fatalities in particular. Most of these studies were conducted between 1978 and 1986.

The results of these studies graphically illustrated in each State when the number of arrests for DWI increased the percentage of alcohol-related fatalities decreased. Further, the results of a study conducted in Florida from 1981-1983 showed when DWI arrests per licensed driver increased total fatalities decreased (12-month moving average).




Slide 34.

It is important to understand how increased DWI enforcement can affect deterrence. Deterrence can vastly exceed the level of enforcement officers achieve on any given night. Weekend DWI arrests can increase by as much as 500%, as in the Stockton study.




**Slide 35.**

The law of averages quickly starts to catch up with DWI drivers. Unless violators change their behavior, many of them will be caught or at least will have known someone who has been arrested. Coupled with the heavy publicity given to the enforcement effort, those experiences were enough to raise the perception level of apprehension among DWI operators that sooner or later they would be caught. As a result, many of them changed their behavior. This is the best example of general deterrence. In addition, during the same time DWI arrests went up over 500% in Stockton, citations for other traffic violations increased by a comparatively modest 99%. The implication is Stockton's officers were stopping and contacting only twice as many possible violators as they had before, but they were coming up with more than five times as many arrests.




**Slide 36.**

What have the results of these studies shown? Basically, they have shown a community will benefit from their officers' increased skills at DWI detection. Principally, because of their special training, the officers were better able to recognize "cues" of impairment when they observed

vehicles in motion, and they were more familiar with the "clues" or human indicators of impairment exhibited by violators during personal contact. The officers also had more confidence in the field sobriety tests they used to investigate their suspects. The most important factor was far fewer of the violators being stopped now avoided detection and arrest. The difficulty in detecting DWI among operators personally contacted by untrained officers has been well documented. Analysis of roadside survey and arrest data suggest for every DWI violator arrested, <u>three others</u> actually have face-to-face contact with police officers but are allowed to go without arrest. Direct support of that inference was found in the Fort Lauderdale BAC study where researchers demonstrated police officers arrested only 22% of the DWI operators they contacted whose BAC levels were subsequently shown to be between 0.10 and 0.20.




Slide 37.

The ability to <u>detect</u> DWI violators is the key to general deterrence and possibly the greatest impediment to it. If we accept the three to one ratio of <u>failed detections</u> as being reasonably accurate, the implications are rather alarming. Consider the impact on a DWI violator's subsequent behavior when, after being stopped by the police, the operator is allowed to continue driving. Very likely, these DWI violators and their friends will become even more convinced of their ability to handle drinking and driving. Further, they will come to believe they will never be arrested because police officers can't determine when they are "over the limit." Instead of creating general DWI deterrence, this attitude breeds <u>specific reinforcement</u>. This helps to develop a feeling among DWI violators they have nothing more to fear from police than an occasional ticket for a minor traffic offense. On the positive side, the ratio of undetected to detected violations suggests much can be accomplished with <u>existing resources</u> if we use those resources as efficiently as possible. By just being able to improve detection skills of law enforcement officers, we could experience an increase in the arrest/violation ratio without any increase in contacts. This same, or better, degree of effectiveness can happen here.



Slide 23.

Vertical Gaze Nystagmus is an involuntary jerking of the eyes (up and down) which occurs when the eyes gaze upward at maximum elevation. The presence of this type of nystagmus is associated with high doses of alcohol for that individual. It may also be present with certain other drugs. The drugs that cause VGN are the same ones that cause HGN. There is no known drug that will cause VGN without causing at least four clues of HGN. If VGN is present and HGN is not, it could be a medical condition. For VGN to be recorded, it must be distinct and sustained for a minimum of four seconds at maximum elevation.



Slide 24.

Resting Nystagmus is referred to as a jerking of the eyes as they look straight ahead. Its presence usually indicates a medical condition or high doses of a Dissociative Anesthetic drug.

E. Vertical Gaze Nystagmus (VGN)




Slide 49.

The VGN test is simple to administer. Look for jerking when the eyes are held at maximum elevation for a minimum of four seconds.

- Position the stimulus horizontally, approximately 12 - 15 inches in front of the subject's nose
- Instruct the subject to hold the head still and follow the object with the eyes only
- Raise the object until the subject's eyes are elevated as far as possible
- Hold for a minimum of four seconds
- Watch closely for evidence of the eyes jerking upward
- Conduct this check at least twice

For VGN to be recorded, it must be distinct and sustained for a minimum of four seconds at maximum elevation. VGN may be present in subjects under the influence of high doses of alcohol for that individual, and some other drugs.

## F. E. Walk and Turn




Slide 50.

*Test Stages*: Like all divided attention tests, WAT has two stages. They are: Instruction stage and Walking stage. Both stages are important because they can affect the subject's overall performance on the test.

*Test Conditions*: Whenever possible, the WAT test should be conducted on a reasonably dry, hard, level, non-slippery surface. There should be sufficient room for subjects to complete nine heel-to-toe steps. Field validation studies have indicated varying environmental conditions have not affected a subject's ability to perform this test. Standardizing this test for every type of road condition is unrealistic. The original research study recommended this test be performed on a dry, hard, level, non-slippery surface and relatively safe conditions. If not, the research recommends: 1) subject be asked to perform the test elsewhere, or 2) only HGN be administered.

The <u>original</u> SCRI studies suggested individuals over 65 years of age or people with back, leg, or inner ear problems had difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age. Also, the SCRI studies suggest individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes. Officers should consider all factors when conducting SFSTs.

F. One Leg Stand




**Slide 59.**

Like all divided attention tests, OLS has two stages. They are: Instruction stage and Balance and Counting stage. Both stages are important because they can affect the subject's overall performance on the test.

*Test Conditions:* Whenever possible, the OLS test should be conducted on a reasonably dry, hard, level, and non-slippery surface. Subject's safety should be considered at all times. Standardizing this test for every type of road condition is unrealistic. The original research study recommended this test be performed on a dry, hard, level, non-slippery surface and relatively safe conditions. If not, the research recommends: 1) subject be asked to perform the test elsewhere; or 2) only HGN be administered. However, field validation studies have indicated that varying environmental conditions have not affected a subject's ability to perform this test.

The original SCRI studies suggested individuals over 65 years of age, people with back, leg or inner ear problems, or people who are overweight by 50 or more pounds may have difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age.

There was no data containing the weight of the test subjects included in the final report. Also, the SCRI studies suggest individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes.

- Keep both legs straight and your arms at your side.
- While holding that position, count out loud in the following manner: "one thousand one, one thousand two, one thousand three," and so on until told to stop.
- Keep your arms at your sides at all times and keep watching the raised foot.
- Do you understand?
- Go ahead and perform the test. (Officer should always time the 30 seconds. Test should be discontinued after 30 seconds.)

Observe the subject from a safe distance. Although not part of the administrative procedures, if the subject puts the foot down, give instructions to pick the foot up again and continue counting from the point at which the foot touched the ground.



Slide 62.

You may observe a number of different behaviors when a subject performs this test. The original research found the behaviors listed below are the most likely to be observed in someone with a BAC at or above 0.08. When administering the OLS test, we look for certain specific behaviors. Each behavior or action is considered one clue. There is a maximum number of 4 clues on this test. Look for the following clues each time the OLS test is administered.

The subject sways while balancing – This refers to side to side or back and forth motion of the body, or a swaying motion of the foot, while the subject maintains the OLS position.

Slight tremors of the foot or body should not be interpreted as swaying.

Uses arm(s) to balance – Subject moves one or both arm(s) 6 or more inches from the side of the body in order to keep balance.

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**FELICIA HAYES** **PLAINTIFF**

**vs.** **Case No. 2:26CV94-BSM**

**THOMAS EVANS; STEVEN ROBERTS; CHRIS CHAPMOND; and MIKE HAGAR** **DEFENDANTS**

---

**COMPLAINT**

---

# Exhibit 6

NHTSA "Refresher" Instructor Guide

Respectfully submitted,

Matt Stauffer

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*

# SFST Refresher

DWI Detection and Standardized Field Sobriety Testing Refresher

# INSTRUCTOR GUIDE

***Emphasize this training course is concerned with HGN and this procedure has been validated as an accurate indicator for alcohol influence by extensive scientific research.***

***Source:***

(1999). *Horizontal Gaze Nystagmus: The Science and the Law: A Resource Guide for Judges, Prosecutors and Law Enforcement.* National Traffic Law Center. National Highway Traffic Safety Administration. Retrieved from https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/horizontal_gaze_nystagmus-the_science_and_the_law.pdf

Any deficiency in eye movement, especially if it is acquired or of recent onset, can impair a person's ability to see properly. Drug impairment, including from alcohol, can affect eye movements in several ways, depending on the nature of the intoxicant used. Drug use, including alcohol, is understood to cause physiological changes that are acquired.

***Source:***

Leigh, R., & Zee, D. (2015). *The Neurology of Eye Movements, Fifth Edition.* Oxford University Press.




Slide 14.

Vertical Gaze Nystagmus is an involuntary jerking of the eyes (up and down) which occurs when the eyes gaze upward at maximum elevation. The presence of this type of nystagmus is associated with high doses of alcohol for that individual. It may also be present with certain other drugs. The drugs that cause VGN are the same ones that cause HGN. There is no known drug that will cause VGN without causing at least four clues of HGN. If VGN is present and HGN

is not, it could be a medical condition. For VGN to be recorded, it must be distinct and sustained for a minimum of four seconds at maximum elevation.




Slide 15.

Resting Nystagmus is referred to as a jerking of the eyes as they look straight ahead. Its presence usually indicates a medical condition or high doses of a Dissociative Anesthetic drug.




Slide 16.

Nystagmus may also be caused by certain pathological disorders. They include brain tumors and other brain damage or some diseases of the inner ear. These pathological disorders occur in very few people and in even fewer drivers. Congenital nystagmus is developed at birth and up to six months, while acquired nystagmus may be caused later in life from medical conditions and/or alcohol or drugs.

heel-to-toe steps. Field validation studies have indicated varying environmental conditions have not affected a subject's ability to perform this test. Standardizing this test for every type of road condition is unrealistic. The original research study recommended this test be performed on a dry, hard, level, non-slippery surface and relatively safe conditions. If not, the research recommends: 1) subject be asked to perform the test elsewhere, or 2) only HGN be administered.

The original SCRI studies suggested individuals over 65 years of age or people with back, leg, or inner ear problems had difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age. Also, the SCRI studies suggest individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes. Officers should consider all factors when conducting SFSTs.

Instructor Note

***Stress to participants to consider age along with environmental factors, location, injury, or physical ailments while administering this test. The importance of the totality of all factors should not be overlooked.***

***Point out subjects with heels two inches or more or any other form of unusual footwear (i.e., flip flops, platform shoes, etc.) should be afforded the opportunity to remove that footwear prior to the test.***

***Remind participants prior to administering psychophysical tests to ask the subject if they have any physical problems or disabilities.***




**Slide 39.**

Instructor Note

***Emphasize the officer should not turn his/her back to the subject for safety reasons.***

Like all divided attention tests, OLS has two stages. They are: Instruction stage and Balance and Counting stage. Both stages are important because they can affect the subject's overall performance on the test.

*Test Conditions:* Whenever possible, the OLS test should be conducted on a reasonably dry, hard, level, and non-slippery surface. Subject's safety should be considered at all times. Standardizing this test for every type of road condition is unrealistic. The original research study recommended this test be performed on a dry, hard, level, non-slippery surface and relatively safe conditions. If not, the research recommends: 1) subject be asked to perform the test elsewhere; or 2) only HGN be administered. However, field validation studies have indicated that varying environmental conditions have not affected a subject's ability to perform this test.

The original SCRI studies suggested individuals over 65 years of age, people with back, leg or inner ear problems, or people who are overweight by 50 or more pounds may have difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age.

There was no data containing the weight of the test subjects included in the final report. Also, the SCRI studies suggest individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes.

Instructor Note

***Stress to participants to consider age and excessive weight along with environmental factors, location, injury, or physical ailments while administering this test. The importance of the totality of all factors should not be overlooked.***

***Point out subjects with any form of any unusual footwear (i.e., flip flops, platform shoes, etc.) should be afforded the opportunity to remove that footwear prior to the test.***

Observe the subject from a safe distance. Although not part of the administrative procedures, if the subject puts the foot down, give instructions to pick the foot up again and continue counting from the point at which the foot touched the ground.




Slide 50.

You may observe a number of different behaviors when a subject performs this test. The original research found the behaviors listed below are the most likely to be observed in someone with a BAC at or above 0.08. When administering the OLS test, we look for certain specific behaviors. Each behavior or action is considered one clue. There is a maximum number of 4 clues on this test. Look for the following clues each time the OLS test is administered.

<u>The subject sways while balancing</u> – This refers to side to side or back and forth motion of the body, or a swaying motion of the foot, while the subject maintains the OLS position.

Instructor Note

***Emphasize swaying means a distinct, noticeable side to side or front to back movement of the elevated foot or of the subject's body.***

Slight tremors of the foot or body should not be interpreted as swaying.

Instructor Note

***Demonstrate swaying.***

<u>Uses arm(s) to balance</u> – Subject moves one or both arm(s) 6 or more inches from the side of the body in order to keep balance.

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**FELICIA HAYES** **PLAINTIFF**

**vs.** **Case No. 2:26cv94-BSM**

**THOMAS EVANS; STEVEN ROBERTS; CHRIS CHAPMOND; and MIKE HAGAR** **DEFENDANTS**

---

**COMPLAINT**

---

# Exhibit 7

NHTSA "Refresher" Training Manual

Respectfully submitted,

Matt Stauffer

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*

# SFST Refresher

DWI Detection and Standardized Field Sobriety Testing Refresher

# PARTICIPANT MANUAL

NHTSA

TSI

C. Course Goal




Slide 4.

The goal of this training is to ultimately increase deterrence of DWI violations; thereby reducing the number of crashes, deaths, and injuries caused by impaired drivers.

D. Driving Under the Influence




Slide 5.

In 2019, 10,142 lives were lost in alcohol-impaired crashes representing 28% of the total motor vehicle fatalities in the U.S.

C. Course Goal




Slide 4.

The goal of this training is to ultimately increase deterrence of DWI violations; thereby reducing the number of crashes, deaths, and injuries caused by impaired drivers.

D. Driving Under the Influence




Slide 5.

In 2019, 10,142 lives were lost in alcohol-impaired crashes representing 28% of the total motor vehicle fatalities in the U.S.




Slide 14.

Vertical Gaze Nystagmus is an involuntary jerking of the eyes (up and down) which occurs when the eyes gaze upward at maximum elevation. The presence of this type of nystagmus is associated with high doses of alcohol for that individual. It may also be present with certain other drugs. The drugs that cause VGN are the same ones that cause HGN. There is no known drug that will cause VGN without causing at least four clues of HGN. If VGN is present and HGN is not, it could be a medical condition. For VGN to be recorded, it must be distinct and sustained for a minimum of four seconds at maximum elevation.




Slide 15.

Resting Nystagmus is referred to as a jerking of the eyes as they look straight ahead. Its presence usually indicates a medical condition or high doses of a Dissociative Anesthetic drug.

dry, hard, level, non-slippery surface and relatively safe conditions. If not, the research recommends: 1) subject be asked to perform the test elsewhere, or 2) only HGN be administered.

The original SCRI studies suggested individuals over 65 years of age or people with back, leg, or inner ear problems had difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age. Also, the SCRI studies suggest individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes. Officers should consider all factors when conducting SFSTs.




Slide 39.

Officers should be mindful of safety precautions when providing instructions for the WAT. By demonstrating the test perpendicular to the subject's "line" and initiating the demonstration with the subject to the left of the officer, the officer will properly demonstrate the turn WITHOUT turning his/her back to the subject. Officers should always be aware of their surroundings and environment when conducting DWI roadside investigations.

elsewhere; or 2) only HGN be administered. However, field validation studies have indicated that varying environmental conditions have not affected a subject's ability to perform this test.

The original SCRI studies suggested individuals over 65 years of age, people with back, leg or inner ear problems, or people who are overweight by 50 or more pounds may have difficulty performing this test. Less than 1.5% of the test subjects in the original studies were over 65 years of age.

There was no data containing the weight of the test subjects included in the final report. Also, the SCRI studies suggest individuals wearing heels more than 2 inches high should be given the opportunity to remove their shoes.




Initiate the test by giving the following instructions, accompanied by demonstrations.

- Please stand with your feet together and your arms down at the sides, like this.
- Do not start to perform the test until I tell you to do so.
- Do you understand the instructions so far?




Slide 50.

You may observe a number of different behaviors when a subject performs this test. The original research found the behaviors listed below are the most likely to be observed in someone with a BAC at or above 0.08. When administering the OLS test, we look for certain specific behaviors. Each behavior or action is considered one clue. There is a maximum number of 4 clues on this test. Look for the following clues each time the OLS test is administered.

The subject sways while balancing – This refers to side to side or back and forth motion of the body, or a swaying motion of the foot, while the subject maintains the OLS position.

Slight tremors of the foot or body should not be interpreted as swaying.

Uses arm(s) to balance – Subject moves one or both arm(s) 6 or more inches from the side of the body in order to keep balance.

E. Concluding Remarks




Slide 11.

***Overall Goal: Briefly remind participants of the importance of DWI deterrence.***

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**FELICIA HAYES** **PLAINTIFF**

**vs.** **Case No.** 2:26cv94-BSM

**THOMAS EVANS; STEVEN ROBERTS; CHRIS CHAPMOND; and MIKE HAGAR** **DEFENDANTS**

---

**COMPLAINT**

---

# Exhibit 8

Administrative License Suspension Form

Respectfully submitted,

Matt Stauff

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*

State of Arkansas
Department of Finance
And Administration

| DRIVER CONTROL USE ONLY | | | |
|---|---|---|---|
| DWI | REF | DRUGS | DENIED |
| DUI | DUI REF | | |
| CMV DUI | CMV DRU | CMV REF | |
| BWI | REF | BUI | BUI REF |
| DISQ. 1 YEAR | | LIFETIME | |
| ENTERED | | VERIFIED | |

## Administrative License Suspension (ALS)

**Omnibus DWI/BWI Law Official Driver License Receipt And Notice of Suspension/Revocation or Disqualification of Driving Privilege**

All information on the front and back of this form is a sworn statement as required under §5-65-102 and §5-65-401

| | | | |
|---|---|---|---|
| Driver Last Name, First, Middle: Hayes Felicia Demetria | Date of Arrest: 7-27-24 | Time: 12:47 | AM PM |
| Mailing Address: 1410 Winchester St | City and County of Arrest: West Memphis Crittenden | | |
| City: Jackson | Arkansas Driver License Number: | License Class: | |
| State: MS / Zip: 39211 | Out-of-State Driver License Number: 801456854 | State: MS | License Class: A |
| Date of Birth: 7-30-68 / Race: B | Sex: F | Height: 5-8 | Vehicle Tag Number: A4 86821 / Vehicle Class: CMV |

This is official notice that the suspension, revocation or disqualification of your driving privilege will begin at midnight of the 30th day from the date of arrest. You have the right to an administrative hearing to contest the revocation, suspension or disqualification of your driving privilege within twenty (20) days from your request for hearing. You must request a hearing within seven (7) calendar days of this notice being given or your request for an administrative hearing to contest will be denied. The attached request for hearing form contains additional instructions. Your vehicle registrations will be suspended if you are charged with a second or subsequent alcohol or drug offense within five years of the first. If you hold a commercial driver license your commercial privilege will be disqualified, whether you are in a commercial vehicle or a non-commercial vehicle at the time of arrest.

The officer is required by law to take all license certificates in your possession and, if you have a valid license, issue a temporary license effective for thirty (30) days. You are required to surrender your driver's license if you have it with you. This document is your receipt for the license surrendered.

☑ Yes ☐ No Driver license, permit, or other evidence of driving privilege surrendered and forwarded with this report.

### Temporary Driver's License – Issued Yes ☐ (Complete license information below)

This document is a temporary driver's license and must be carried with you when driving. This temporary license expires at midnight, 30 days from the date of arrest.

Issue Date: 7-27-24 Class: A End.: NL Rest.: B Organ Donor: ☐ Yes ☑ No

### No temporary license issued check reason below:

☐ Expired ☐ Suspended ☐ Revoked ☐ No driver license ☐ Other: ______

By this Notice I am advised that if I am intoxicated or if a chemical test indicates an alcohol concentration of eight-hundredths of one percent (0.08%) or more for DWI/BWI offenses, four-hundredths of one percent for CDL offenses (0.04%) or two-hundredths of one percent for Underage DUI/BUI offenses (0.02% through 0.07%) or the presence of other intoxicating substances or combination of substances, my privileges to drive will be revoked, suspended, disqualified or denied as provided for by Arkansas Code Annotated §5-65-104 for DWI/BWI, §27-23-112 for CDL, or §5-65-304 for Underage DUI/BUI, and if I refuse to submit to the test or tests, my driving privilege will be revoked, suspended, disqualified or denied as a result of the refusal.

[signature] Signature of Driver 7/27/24 Date

*Law enforcement officer must give a copy of this notice to each person arrested for violating this law even if the person does not have a valid driver license or if he or she refuse to sign or is unable to sign.*

☐ Refused to sign ☐ Unable to sign

**Arresting officer must check the applicable boxes**

| | | | | |
|---|---|---|---|---|
| ☐ DWI ALC § 5-65-103 | ☐ DUI UNDERAGE § 5-65-303 | ☐ CMV DWI § 27-23-112 | ☐ BWI ALC § 5-65-103 | ☐ BUI UNDERAGE § 5-65-303 |
| ☐ DWI DRUGS § 5-65-103 | ☐ DUI REFUSAL § 5-65-310 | ☑ CMV DWI/DRUGS § 27-23-112 | ☐ BWI DRUGS § 5-65-103 | ☐ BUI REFUSAL § 5-65-310 |
| ☐ DWI REFUSAL § 5-65-205 | | ☐ CMV REFUSAL § 27-23-112 | ☐ BWI REFUSAL § 5-65-205 | |
| | | ☐ TRANSPORTING HAZARDOUS MATERIALS § 27-23-112 | | |

**White Copy to:**
**Driver Control**
P O. Box 8078
1900 W. 7th, Room 1070
Little Rock, AR 72203
(501) 682-7212

630-0001 (R 10-17) **(BOTH SIDES MUST BE COMPLETED BY ARRESTING OFFICER)** Page 1(White) Front

1 On the 27 day of July, 2024 at or near MLK I-55 the arrested person named on the reverse side had been driving or operating, or was in actual physical control while intoxicated, or while the person's blood alcohol concentration (BAC) was 0.08 % or more DWI/BWI, 0.04 % CDL, or 0.02 % through 0.07 % Underage DUI/BUI in a motor vehicle/motorboat or refused to submit to chemical test(s)

2 Type of Vehicle being operated ☐ Non commercial ☑ Commercial vehicle ☐ Motorboat ☐ Hazardous materials

3 Reason for initial contact.
☐ Vehicle stopped by officer for violation of traffic law (describe) ____
☑ Accident ____
☐ Vehicle already stopped (describe) ____
☐ Other (describe) ____

4 Reasonable grounds that person was operating or in actual physical control of a motor vehicle or motorboat
☐ Saw person ☑ Person admitted ☐ Keys in ignition ☐ Motor running ☐ Person behind the wheel
☑ Other (describe) Wald Officer observed

5 Reasonable grounds that person was intoxicated:
☐ Odor of intoxicants ☐ Bloodshot eyes ☐ Watery eyes ☐ Portable breath result: ____
☑ Manner of driving ☐ Other ____

Speech was:
☐ Slurred ☐ Incoherent ☐ Normal ☑ Other Very Slow deliberate

Balance was.
☑ Swaying ☐ Wobbling ☐ Falling ☐ Sagging Knees ☐ Normal ☐ Other ____

Attitude (describe) ____

Field sobriety test given: ☑ HGN ☑ One Leg Stand ☑ Nine Step Walk & Turn ☐ Other ☐ None Given

Results. Intox

6. Other pertinent information: ____

7. The person's intoxication was the result of ☐ Alcohol ☑ Controlled Substance
☐ Other (describe): ____

8. The person was requested to submit to a chemical test of his or her breath for the purpose of determining alcohol content and upon being offered the chemical test of his or her breath.

☑ The person was informed of his or her rights

☐ The person provided a breath sample that resulted in a test result of 0 ____%
Time of test ____ A M. / P M

The test was administered in accordance with the requirements and regulations of Arkansas Department of Health

The certified breath test operator was: Name ____

Operator Certification No.: ____ Instrument Serial No.: ____

A test was performed on the driver's: ☐ breath ☐ blood ☑ urine ☐ saliva

The results are ☐ included ☑ and/or pending

**OR**

☐ Refused to submit to the chemical test and was informed that his or her driving privilege would be revoked, suspended, disqualified or denied as a result of his or her refusal

9. The notice and order of suspension, revocation or disqualification has been delivered to the person named on the reverse side.
☑ Yes ☐ No Date Delivered 7-27-24

Attach (staple) a copy of breath test results, driver's license, Statement of Rights form and any relative documents pertaining to the arrest

Officer Thomas D Evans of ASP Badge # 178
hereby swears, under penalty of perjury, that the information on the front and back of this form is true and correct:

Thomas D. Evans 7-27-24 870 633 1454
Signature of Arresting Officer Date Arresting agency telephone number

630 0002 (MUST BE SIGNED AND FULLY COMPLETED BY ARRESTING OFFICER) Page 2 (White) Back

# ARKANSAS STATEMENT OF RIGHTS – DWI, REFUSAL TO SUBMIT, OR DUI

NAME OF SUBJECT AND DL #: Felicia Hayes MS 801456854 DATE AND TIME OF INCIDENT: 7-27-24 12:45Am

**PART ONE – READ ALL SECTIONS TO SUBJECT AND HAVE SUBJECT INITIAL AND SIGN WHERE INDICATED**

You are advised that any person who operates a motor vehicle or is in actual physical control of a motor vehicle in this state is deemed to have given consent to a chemical test or tests of his or her blood, breath, or urine for the purpose of determining the alcohol or controlled substance content of his or her breath or blood if the person is:

(1) Involved in an accident while operating or in actual physical control of a motor vehicle;
(2) The person is arrested for any offense arising out of an act alleged to have been committed while the person was driving while intoxicated or driving while there was an alcohol concentration of eight hundredths (0.08) or more in the person's breath or blood;
(3) At the time the person is arrested for driving while intoxicated, the law enforcement officer has reasonable cause to believe that the person, while operating or in actual physical control of a motor vehicle, is intoxicated or has an alcohol concentration of eight hundredths (0.08) or more in the person's breath or blood, or
(4) UNDER 21 ONLY – The person is underage (under the age of 21) and is arrested for any offense arising out of an act alleged to have been committed while the underage person was driving while under the influence or driving while there was an alcohol concentration of two-hundredths (0.02) but less than eight-hundredths (0.08) in his or her breath or blood; OR
(5) UNDER 21 ONLY – The person is underage and is stopped by a law enforcement officer who has reasonable cause to believe that the underage person, while operating or in actual physical control of a motor vehicle, is under the influence or has an alcohol concentration of two-hundredths (0.02) but less than eight-hundredths (0.08) in his or her breath or blood.

**HAVE SUBJECT INITIAL EACH SECTION**

FH ______ If you refuse to take the test or tests, none will be given, but you will subject yourself to the penalties provided by law, which includes, but is not limited to, the suspension or revocation of your driving privileges, and if you are a commercial driver's license holder, the disqualification of your commercial driving privileges

FH ______ If you choose to take the test or tests, and the results reflect an alcohol concentration of eight hundredths (.08) or more, or the presence of a controlled substance, or any other intoxicant, your driving privilege will be suspended or revoked, and if you are the holder of a commercial driver's license, your commercial driving privileges will be disqualified.

FH ______ CMV OPERATOR ONLY – If you choose to take the test or tests, and the results reflect an alcohol concentration of four hundredths (.04) or more or the presence of a controlled substance or any other intoxicant for a violation occurring in a commercial vehicle, your commercial driving privileges will be disqualified.

______ UNDER 21 ONLY – If you are under age 21 and you choose to take the test or tests and the results reflect an alcohol concentration of two hundredths (.02) but less than eight hundredths (.08), your driving privilege will be suspended or revoked.

FH ______ If you take the test or tests requested by law enforcement, you may also, at your own expense, have a physician, registered nurse, lab technician, or other qualified person of your choice administer an additional breath, blood, or urine test. This department will assist you in obtaining such a test. If you choose to have an additional test, and are later found "Not Guilty" of violation of the Omnibus DWI Act or the Underage DUI Law for this arrest, the arresting law enforcement agency will reimburse you for the cost of the additional test.

**DO YOU UNDERSTAND ALL PARTS OF THESE RIGHTS?** ✓ YES ______ NO

Test chosen by officer (Circle One): Breath (Urine) Blood

**WILL YOU TAKE THE TEST?** FH YES ______ NO

Subject's Signature: Felicia Hayes Officer's Signature and Date/Time: [signature] 7-27-24 1:05Am

**SECOND TEST – IF OFFICER DEEMS NECESSARY**

Arkansas law permits an officer to require a test or tests of the blood, breath, or urine of a person arrested for driving while intoxicated. Having taken my first test, you are now requested to submit to a second chemical test of your blood, breath, or urine

Test chosen by officer (Circle One): Breath Urine Blood

**WILL YOU TAKE THE SECOND TEST?** ______ YES ______ NO

Subject's Signature: ______ Officer's Signature and Date/Time: ______

**PART TWO – TO BE COMPLETED BY OFFICER WHEN THE SUBJECT HAS TAKEN ALL TESTS**

Having taken the officer's test or tests, you have the right to an additional test or tests to determine the alcohol, controlled substance, or other intoxicant content of your blood

**DO YOU WANT ANOTHER TEST AT YOUR OWN EXPENSE?** ______ YES ✓ NO

Subject's Signature: Felicia Hayes Officer's Signature and Date/Time: [signature] 7-27-24 1:30Am

# ARKANSAS STATE CRIME LABORATORY
## EVIDENCE SUBMISSION FORM
### DRUGS & TOXICOLOGY ONLY

www.crimelab.arkansas.gov

P.O. Box 8500, 3 Natural Resources Dr, Little Rock AR 72215, Phone (501) 227-5747, Fax (501) 227-0713
P.O. Box [illegible], 2500 South Main St, Hope AR 71801, Phone (870) 777-85[illegible], Fax (870) 777-8534
P.O. Box 1134, 1125 N. Monroe Ave, [illegible] AR 7174[illegible], Phone [illegible]

☐Y ☒N Has any evidence been previously submitted on this case by any agency?

*If known, list ASCL case #*

Agency Case #: 300A2176274

ASCL Case #:

Investigating Agency: Arkansas State Police

Investigating Officer (*LAST, First, Title*): Evans, Dylan, TRP.

If applicable, please list additional agencies involved:

Phone: 870-633-1454

Mobile (*optional*):

Type of Offense: DWI Drugs

Date of Offense: 7/27/2024

County of Offense: Crittenden

E-Mail Address: thomas.d.evans@asp.arkansas.gov

| | Suspect | Victim | Name (LAST, First) | Arrested? | SID/SSN | DOB | Race | Sex |
|---|---|---|---|---|---|---|---|---|
| 1 | ☒ | ☐ | Hayes, Felicia | ☒Y ☐N | | 7/30/1968 | B | F |
| 2 | ☐ | ☐ | | ☐Y ☐N | | | | |
| 3 | ☐ | ☐ | | ☐Y ☐N | | | | |
| 4 | ☐ | ☐ | | ☐Y ☐N | | | | |
| 5 | ☐ | ☐ | | ☐Y ☐N | | | | |
| 6 | ☐ | ☐ | | ☐Y ☐N | | | | |

| Evidence # | Evidence Description | Evidence Source | Requested Service(s) |
|---|---|---|---|
| E-1 | Urine Test | Hayes | TOX |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Detailed Summary of Crime** (*Use provided addendum if necessary*):
CMV accident-driver arrested for DWI drugs

**Type of Analysis Requested:**
Tox

☐Y ☐N Were all urine samples for alcohol testing collected by Arkansas Department of Health (ADH) guidelines?

☐Y ☐N ARORA donor?

**Requested Service Codes:**

TOX: Toxicology
*Blood alcohol, drug impairment, death investigation*

DA: Drug Analysis
*Powders, pills, vegetable material*

IL: Illicit Laboratories
*(Please notify ER Technician)*

TP: Tampering

***Important—please note the following:***

- The Arkansas State Crime Laboratory (ASCL):
  - Shall select and use appropriate testing methods/procedures
    (*Please visit the ASCL website to see available methods:* www.crimelab.arkansas.gov)
  - Reserves the right to transfer evidence to another accredited laboratory when deemed necessary
- Evidence Packaging and Labeling:
  - All evidence shall be properly packaged and sealed to prevent contamination and/or tampering
  - All biologically contaminated evidence must be marked BIOHAZARD
  - Sharps must be packaged in such a manner as to protect personnel during handling
- See the list of included/excluded report elements at: goo.gl/4fYNrv
  - Give us feedback! Please fill out our Performance Survey at: forms.gle/ps49naJmPKUeZ1aA

**LAB USE ONLY**

Submitting Officer (please print):
SGT. LEVI FLEMING #420

Signature

Date

*By signing here, I agree to a streamlined report. For included/excluded report elements, see the ASCL website. All excluded elements are available upon request.*

*Document:* ASCL-FORM-63 [ID 3561, rev 5]
*Approved by:* Moran, Cindy, Black, Ryan

*Revision date:* 03/23/2020

the test if she wanted to try the test.

68. Ms. Hayes told Trp. Evans that she did not think that she could perform the test. However, she also did not want to appear uncooperative, so she told Trp. Evans that she needed to try to take the test anyways.

69. Trp. Evans administered the Walk and Turn test and noted that Ms. Hayes failed the test. Trp. Evans justified his eventual arrest of Ms. Hayes, in part, on claiming she failed the Walk and Turn test.

70. Trp. Evans administered the One Leg Stand test.

71. Pursuant to both the training manual and the participant manual, the Walk and Turn test is "83% accurate at detecting subjects at or above 0.08 BAC [blood alcohol content]." The training materials provide no claim regarding the accuracy of such test to determine whether a person is possibly intoxicated by drugs.

72. The training materials recognize that persons with "back, leg, or inner ear problems have difficulty performing this test." **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual); **Ex. 6** ("Refresher" Instructor Guide); **Ex. 7** ("Refresher" Training Manual).

73. As noted above, Ms. Hayes had already notified Trp. Evans that she suffered from back and hip issues.

74. According to the training materials, an officer must observe at least two (2) clues for a subject to fail the One Leg Stand test.

75. Trp. Evans audibly noted in the dash camera video that Ms. Hayes was swaying. However, Ms. Hayes had not swayed.

76. According to the NHSTA instructor and training materials, when an officer is observing a subject performing the One Leg Stand, slight tremors of the foot or body should not be interpreted as swaying. **Ex. 4** (Instructor Guide); **Ex. 5** (Training Manual); **Ex. 6** ("Refresher" Instructor Guide); **Ex. 7** ("Refresher" Training Manual) 1.

77. Trp. Evans counted slight tremors as "swaying," which he counted as one of two "clues" observed. Trp. Evans used this improper observation and the fact that Ms. Hayes briefly put down her foot after twenty-two (22) seconds as a basis for observing two (2) clues, claiming that Ms. Hayes failed the One Leg Stand.

78. Trp. Evans justified his eventual arrest of Ms. Hayes, in part, claiming she failed the One Leg Stand test.

79. Trp. Evans arrested Ms. Hayes for DWI (drugs). As Trp. Evans explained it to Ms. Hayes immediately after handcuffing her, he felt that she was under the influence of "some sort of intoxicant." Trp. Evans has never stated to Ms. Hayes or otherwise documented what "intoxicant" he believed she was supposedly under the influence.

80. Trp. Evans placed Ms. Hayes in the back of his patrol vehicle. Immediately after securing Ms. Hayes in the back of his patrol vehicle, Trp. Evans removed or disabled his body microphone. With his body microphone removed or disabled, Trp. Evans then engaged in a conversation with Sgt. Roberts, who had pulled his vehicle next to Trp. Evans. Upon information and belief, at least part of the conversation between Trp. Evans and Sgt. Roberts was about Ms. Hayes, their

investigation, their testing, and the decision to arrest her.

81. Neither Trp. Evans nor Sgt Roberts recorded this conversation, despite the fact that the arrest of Ms. Hayes was still ongoing.

*Mobile Video Recordings and Body Worn Cameras*

82. The Arkansas State Police have a written policy on in-car ("mobile video recording" or "MVR").

83. According to ASP policy, an officer should ensure that the MVR video and audio recording are activated on all events, including crash investigations and arrets.

84. The MVR video records forward through the vehicle's front windshield and from a separate camera directed at the backseat. The audio records inside the vehicle. Additionally, if an officer is not equipped with a body camera, then policy dictates that he "should carry the wireless microphone on his/her person in a manner where the microphone is capable of receiving all conversations taking place between the officer(s) and the person(s) who are subject(s) of the events." Additionally, according to ASP policy, "microphones shall not be turned off with the purpose of avoiding the recording of an event or for any other improper purpose. Intentionally turning off the cameras and/or microphones during an event is cause for disciplinary action." Officers are only permitted to turn off their microphones "if doing so will not defeat the purpose of collecting any evidentiary information."

85. Pursuant to ASP policy, digital recordings should be classified at the conclusion of each event, and the classification determines the length that the ASP

will retain the recordings. For traffic events or crashes, ASP will retain the video for a year. And for DWI arrests, ASP will retain the recordings for four (4) years.

86. Sgt. Roberts failed to record or properly preserve the events during any portion of his encounter with Ms. Hayes or any other part of the investigation. Ms. Hayes did not receive any recordings from Sgt. Roberts MVR in her criminal discovery or pursuant to a Freedom of Information Act request.

87. Trp. Evans preserved his MVR video from the investigation and arrest of Ms. Hayes. However, he only recorded part of the audio of the investigation and arrest, intentionally removing or disabling his microphone after placing Ms. Hayes in handcuffs in his vehicle. He deliberately failed to record his conversation with Sgt. Roberts immediately following Ms. Hayes arrest, and he failed to record any audio after arriving at the county jail, which included his reading Ms. Hayes her DWI rights form, chemical testing, and Ms. Hayes' formal arrest and charging.

*Actions After Arrest*

88. Trp. Evans drove Ms. Hayes back to the area of her truck on the bridge, and a WMPD officer provided a citation to Ms. Hayes for traffic violations.

89. At the jail, Trp. Evans administered a preliminary breath test to Ms. Hayes, which returned a BAC (blood alcohol content) result of 0.000%.

90. At the jail, Ms. Hayes consented to provide a urine sample, and Trp. Evans collected a urine sample from Ms. Hayes.

91. Ms. Hayes was neither evaluated by a Drug Recognition Expert nor evaluated by a trooper or an officer who was ARIDE certified.

92. Ms. Hayes was booked into the Crittenden County Jail in the early morning hours of July 27, 2024, at approximately 12:49 a.m.

93. Trp. Evans knew when he arrested Ms. Hayes that her truck and trailer would be towed, and that her dogs would be placed in a shelter until Ms. Hayes could post her bond and retrieve them.

94. Ms. Hayes' truck and trailer were towed, and her two dogs that traveled with her were placed in a shelter until she posted bond and retrieved them.

95. Trp. Evans knew that based upon an arrest for DWI (drugs), and pursuant to Arkansas statute, he was required to seize Ms. Hayes' commercial driver's license.

96. Trp. Evans seized Ms. Hayes commercial driver's license. Based upon his arrest of Ms. Hayes for DWI (drugs) and the paperwork he submitted to Arkansas Driver Control—sworn under the penalty of perjury—Arkansas Driver Control suspended Ms. Hayes' driver's license for six (6) months.

*Arkansas Driver Control*

97. Subsequent to Ms. Hayes arrest, Trp. Evans completed and submitted the Administrative License Suspension form (ALS Form) to the Arkansas Driver Control. The ALS Form is attached as **Exhibit 8**. As part of the form, Trp. Evans provided information related to and attempting to justify his arrest of Ms. Hayes for DWI (drugs). Trp. Evans knew that Driver Control would rely on this information as the sole basis for suspending Ms. Hayes' driver's license.

98. On the ALS Form, Trp. Evans stated that he performed the HGN, One

Leg Stand, and Nine Step Walk & Turn tests, and based upon these tests that Ms. Hayes was intoxicated by a "controlled substance." **Ex. 8** (ALS Form). Trp. Evans then swore under the penalty of perjury that the information in the form was true and correct. **Id.**

Based solely upon this form, Arkansas Driver Control suspended Ms. Hayes driver's license and privileges for six (6) months.

*Adoption and Implementation of Training that Prioritizes Arrests*

99. Col. Hagar is the Director of the Arkansas State Police and the Secretary of the Arkansas Department of Public Safety. Additionally, he serves on the Arkansas State Police Association's executive board. As the Secretary of Public Safety, Col. Hagar is the cabinet secretary over the Commission on Law Enforcement Standards and Training.

100. At the time of Ms. Hayes arrest, Col. Hagar and CLEST director Dir. Chapmond were responsible for implementing minimum training standards and were responsible for adopting and promulgating the DWI training materials, which are taught by certified trainers throughout the State of Arkansas.

101. Col. Hagar and Dir. Chapmond were not required to adopt the NHTSA DWI training materials, and their adoption and/or continued use of such materials was a deliberate choice.

102. The policy of inducing fear into the general driving public through specific and general deterrence—arrests—exhibits a deliberate indifference to the rights of persons whom the troopers come into contact. It is a conscious decision by

Col. Hagar and Director Chapmond to train officers to concern themselves with the policy implications of an arrest instead of the Constitutional implications of that same arrest.

103. The policy to "vigorously enforce" DWI offenses, the policy of deterrence through arrest, and ASP's training materials all emphasize that the "ultimate goal" is to make an arrest. The effect 1) creates the unnecessary danger of unlawful arrests and 2) provides officers with unfettered discretion in DWI investigations. Ms. Hayes arrest was foreseeable, and the proximate result of Col. Hagar's and Director Chapmond's actions.

*Damages*

104. At the time of her arrest, Ms. Hayes had earned a living as a commercial truck driver. Her income from working as a commercial truck driver paid for her tractor-trailer rig and her personal affairs.

105. As a result of her unlawful arrest, Arkansas Driver Control suspended her driver's license for six months. During this time, Ms. Hayes was unable to adequately earn money to sustain her bills and living expenses. Ms. Hayes could not afford the her commercial insurance, and she was forced to dissolve her trucking business and forced to sell her tractor-trailer rig. With the loss of her business and rig, she lost her ability to earn an income even after her license was later reinstated.

106. As a result of her inability to pay her bills after her arrest, Ms. Haye's personal vehicle was repossessed, and she has endured other hardships, including the loss of her health insurance.

107. Prior to her arrest, Ms. Hayes earned an income significantly enough to support her life and lifestyle. And it was her intent to continue in commercial driving and earn the income that it provided until approximately sixty-five (65) years of age. As a result of her arrest, Ms. Hayes no longer engages in commercial trucking.

108. Ms. Hayes incurred an initial cost to retrieve her tractor-trailer rig from impound after her arrest, the cost of a criminal attorney, and the loss her brand new firearm that was confiscated and is believed to have been lost by law enforcement.

109. Ms. Hayes' unlawful arrest and the entailing losses have not only created financial hardships, but have also caused her significant emotional distress.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(42 U.S.C. § 1983)**
**(Violation of the United States Constitution, Fourth Amendment—Unlawful Arrest)**
**(Against Trp. Evans and Sgt. Roberts)**

110. Plaintiff hereby re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

111. 42 U.S.C. § 1983 provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit at equity, or other proper proceeding for redress."

112. The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

113. Plaintiff has, and had at the time of the incident, a firmly established right under the Fourth Amendment to be free from unreasonable seizures of her person and to be free from arrest without warrant or probable cause.

114. Trp. Evans and Sgt. Roberts arrested Plaintiff without probable cause and without a warrant. No officer, knowledgeable in the law for which they are entrusted to enforce, could reasonably believe that Plaintiff committed the offense of Driving While Intoxicated (Drugs).

115. Sgt. Roberts trained Trp. Evans on how to conduct DWI investigations. Sgt. Roberts was also the supervising officer on the scene of Ms. Hayes' arrest, and he was directly involved in the investigation and arrest of Ms. Hayes' for DWI.

116. Trp. Evans and Sgt. Roberts conspired with one another during the investigation and arrest of Ms. Hayes for DWI to circumvent probable cause and to reinforce their predetermined and unsubstantiated belief that Ms. Hayes was intoxicated, despite objective proof exonerating her.

117. Trp. Evans ignored his law enforcement training materials on how to perform a DWI investigation. Instead, Trp. Evans and Sgt. Roberts implemented the ASP policy of specific and general deterrence, and he arrested Ms. Hayes for DWI (drugs) without probable cause.

118. Trp. Evans removed his microphone while an arrest was ongoing and

while Ms. Hayes was in his immediate custody and control. Such conduct evidences a deliberate intent by Trp. Evans to avoid scrutiny for his unconstitutional conduct and demonstrates a consciousness of guilt to conceal his actions.

119. Sgt. Roberts failed to record or preserve the video and audio from his own patrol vehicle. And, he failed to train, supervise, or correct Trp. Evans when Trp. Evans removed his microphone while an arrest was ongoing and while Ms. Hayes was in Trp. Evans' immediate custody and control. Such conduct evidences a deliberate intent by Sgt. Roberts to avoid scrutiny for their unconstitutional conduct and demonstrates a consciousness of guilt to conceal his actions.

120. The conduct alleged herein was done in a willful, malicious, intentional, and deliberate manner. At the very least, the conduct was carried out with a reckless disregard of Plaintiff's constitutionally protected rights, welfare, and safety as to constitute the equivalent of ill will.

121. The conduct alleged herein deprived Ms. Hayes of her civil rights which are protected under the United States Constitution and its Amendments. The conduct alleged herein has also legally, proximately, foreseeably, and actually caused Plaintiff to suffer loss of income, emotional distress, humiliation, and further damages according to proof at the time of trial.

122. In addition to all damages and awards authorized by law, Plaintiff is entitled to an award of attorneys' fees.

## SECOND CAUSE OF ACTION

**(Ark. Code Ann. § 16-123-105 – Arkansas Civil Rights Act)**
**(Violation of the Arkansas Constitution, Art. 2, § 15—Unlawful Arrest)**
**(Against Trp. Evans and Sgt. Roberts)**

123. Plaintiff hereby re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

124. Ark. Code Ann. § 16-123-107 provides "Every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action in circuit court for legal and equitable relief or other proper redress."

125. Article 2, Section 15 of the Arkansas Constitution reads "The right of the people of this State to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

126. Plaintiff has, and had at the time of the incident, a firmly established right under Art. 2, § 15 of the Arkansas Constitution to be free from unreasonable seizures of his person and to be free from arrest without warrant or probable cause.

127. Trp. Evans and Sgt. Roberts arrested Plaintiff without probable cause and without a warrant. No officer, knowledgeable in the law for which they are entrusted to enforce, could reasonably believe that Plaintiff committed the offense of Driving While Intoxicated (Drugs).

128. Sgt. Roberts trained Trp. Evans on how to conduct DWI investigations. Sgt. Roberts was also the supervising officer on the scene of Ms. Hayes' arrest, and

he was directly involved in the investigation and arrest of Ms. Hayes' for DWI.

129. Trp. Evans and Sgt. Roberts conspired with one another during the investigation and arrest of Ms. Hayes for DWI to circumvent probable cause and to reinforce their predetermined and unsubstantiated belief that Ms. Hayes was intoxicated, despite objective proof exonerating her.

130. Trp. Evans ignored his law enforcement training materials on how to perform a DWI investigation. Instead, Trp. Evans and Sgt. Roberts implemented the ASP policy of specific and general deterrence, and he arrested Ms. Hayes for DWI (drugs) without probable cause.

131. Trp. Evans removed his microphone while an arrest was ongoing and while Ms. Hayes was in his immediate custody and control. Such conduct evidences a deliberate intent by Trp. Evans to avoid scrutiny for his unconstitutional conduct and demonstrates a consciousness of guilt to conceal his actions.

132. Sgt. Roberts failed to record or preserve the video and audio from his own patrol vehicle. And, he failed to train, supervise, or correct Trp. Evans when Trp. Evans removed his microphone while an arrest was ongoing and while Ms. Hayes was in Trp. Evans' immediate custody and control. Such conduct evidences a deliberate intent by Sgt. Roberts to avoid scrutiny for their unconstitutional conduct and demonstrates a consciousness of guilt to conceal his actions.

133. The conduct alleged herein deprived Ms. Hayes of her civil rights which are protected under the Arkansas Constitution. The conduct alleged herein has also legally, proximately, foreseeably, and actually caused Plaintiff to suffer loss of

income, pain and suffering, emotional distress, fear, humiliation, and further damages according to proof at the time of trial.

134. In addition to all damages and awards authorized by law, Plaintiff is entitled to an award of attorneys' fees.

## THIRD CAUSE OF ACTION
## (Ark. Code Ann. § 25-44-305 – Tort)
## (Malicious Prosecution)
## (Against Trp. Evans and Sgt. Roberts)

135. Plaintiff hereby re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

136. Defendants Trp. Evans and Sgt. Roberts initiated a criminal proceeding against Ms. Hayes for purportedly violating Ark. Code Ann. § 5-65-103 (Driving While Intoxicated-Drugs).

137. The arrest was made without probable cause and with proof dispositive of guilt. The conduct alleged herein was done in willful, malicious, intentional, and deliberate manner. At the very least, the conduct was carried out with a reckless disregard of Plaintiff's constitutionally protected rights, welfare, and safety as to constitute the equivalent of malice.

138. Trp. Evans and Sgt. Roberts arrested Ms. Hayes because (1) because of her race; (2) in furtherance of a policy to instill fear in driving public; and (3) without regard or adherence to their training on how to perform and interpret the standard field sobriety testing.

139. The investigation and arrest decision were made with unfettered discretion and demonstrated a sinister to motive for the arrest.

140. Furthermore, Trp. Evans and Sgt. Roberts knew that once Ms. Hayes was arrested for DWI, Arkansas law prohibits any person from reducing or dropping the DWI charge, and Ms. Hayes would be forced pursue the matter to trial to exonerate herself.

141. Defendants Trp. Evans and Sgt. Roberts also knew that Ms. Hayes possessed a commercial driver's license, and that she earned income as a commercial driver. Furthermore, they knew that her arrest would lead to her driving privileges being suspended.

142. Subsequent to and in furtherance of the arrest, Trp. Evans completed and submitted the Administrative License Suspension to the Arkansas Driver Control, swearing, under the penalty of perjury, that Ms. Hayes was intoxicated. Trp. Evans knew that Driver Control would rely on his statements on the submitted paperwork to suspend Ms. Hayes driver's license.

143. Ms. Hayes was not intoxicated and she was acquitted of the criminal charge.

144. The conduct alleged herein has also legally, proximately, foreseeably, and actually caused Plaintiff to suffer loss of income, pain and suffering, emotional distress, fear, humiliation, and further damages according to proof at the time of trial.

145. In addition to all damages and awards authorized by law, Plaintiff is entitled to an award of attorneys' fees.

**FOURTH CAUSE OF ACTION**
**(Ark. Code Ann. § 25-44-305 – Tort)**
**(Abuse of Process)**
**(Against Trp. Evans and Sgt. Roberts)**

146. Plaintiff hereby re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

147. Defendants Trp. Evans and Sgt. Roberts initiated a criminal proceeding against Ms. Hayes for purportedly violating Ark. Code Ann. § 5-65-103 (Driving While Intoxicated-Drugs).

148. The arrest was made without probable cause and with proof dispositive of guilt. The conduct alleged herein was done in willful, malicious, intentional, and deliberate manner. At the very least, the conduct was carried out with a reckless disregard of Plaintiff's constitutionally protected rights, welfare, and safety as to constitute the equivalent of malice.

149. The legal process was perverted and used to accomplish one or more ulterior purposes for which it was not designed. Trp. Evans and Sgt. Roberts arrested Ms. Hayes because (1) because of her race; (2) in furtherance of a policy to instill fear in the driving public; and (3) without regard or adherence to their training on how to perform and interpret the standard field sobriety testing. Such arrest was made without Constitutional considerations of probable cause and was the culmination of unfettered discretion.

150. Furthermore, Trp. Evans and Sgt. Roberts knew that once Ms. Hayes was arrested for DWI, Arkansas law prohibits any person from reducing or dropping the DWI charge, and Ms. Hayes would be forced to go to trial to exonerate herself.

151. Defendants Trp. Evans and Sgt. Roberts also knew that Ms. Hayes

possessed a commercial driver's license, and that she earned income as a commercial driver. Furthermore, they knew that her arrest would lead to her driving privileges being suspended, which would inhibit her ability to engage in her career as a commercial driver.

152. Subsequent to and in furtherance of the arrest, Trp. Evans completed and submitted the Administrative License Suspension to the Arkansas Driver Control, swearing, under the penalty of perjury, that Ms. Hayes was intoxicated. Trp. Evans knew that Driver Control would rely on his statements on the submitted paperwork to suspend Ms. Hayes driver's license.

153. Ms. Hayes was not intoxicated, and she was acquitted of the criminal charge.

154. The conduct alleged herein has also legally, proximately, foreseeably, and actually caused Plaintiff to suffer loss of income, pain and suffering, emotional distress, fear, humiliation, and further damages according to proof at the time of trial.

155. In addition to all damages and awards authorized by law, Plaintiff is entitled to an award of attorneys' fees.

## FIFTH CAUSE OF ACTION
**(42 U.S.C. § 1983 and ACRA)**
**(Failure to Train and Failure to Supervise)**
**(Against Sgt. Roberts)**

156. Plaintiff hereby re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

157. Sgt. Roberts was the instructor during Trp. Evans' most recent DWI "Refresher" course prior to Ms. Hayes arrest. Sgt. Roberts failed to properly train

Trp. Evans on how to conduct the tests, and the implication that observing no horizontal gaze nystagmus precludes intoxication.

158. With minimal observation and without having conducted any testing on Ms. Hayes himself, Sgt. Roberts told Trp. Evans several times prior to testing that Ms. Hayes was intoxicated from drugs.

159. Prior to performing field sobriety tests on Ms. Hayes, Trp. Evans told Sgt. Roberts that he was not ARIDE or DRE certified, demonstrating his concern in performing field sobriety tests for a DWI (drug) offense. He also demonstrated a lack of knowledge on even what tests to perform. Despite this interaction, Sgt. Roberts consciously disregarded Trp. Evans' lack of training, experience, and knowledge, and failed to supervise Trp. Evans' performance of the field sobriety tests.

160. Sgt. Roberts failure to train and failure to supervise Trp. Evans, which effectively authorized Trp. Evans unfettered discretion to make an arrest on a bare suspicion that an offense had been committed rather than on probable cause.

161. By reason of the aforementioned deficient training and supervision, Ms. Hayes suffered out of pocket expenses, loss of income, emotional distress, pain and suffering, fear, humiliation, and further damages according to proof at the time of trial.

## SIXTH CAUSE OF ACTION
**(42 U.S.C. § 1983 and ACRA)**
**(Failure to Train)**
**(Against Col. Hagar and Dir. Chapmond)**

162. Plaintiff hereby re-alleges and incorporates by reference all preceding paragraphs of this Complaint.

163. Defendants Col. Hagar and Dir. Chapmond violated Plaintiff's Fourth Amendment right to be free from unlawful arrest.

164. Defendants Col. Hagar and Dir. Chapmond maintained a widespread informal and formal practice, policies and customs, and training to arrest suspects of DWI without probable cause that the person was intoxicated. This was done in furtherance of their stated goals, disseminated through their training, emphasizing their desire that troopers make DWI arrests and to implement a policy of deterrence through fear of arrest.

165. Defendants Col. Hagar and Dir. Chapmond, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs, and training alleged in the paragraphs above. Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of their actions on the constitutional rights of Plaintiff and other individuals similarly situated.

166. The policies, practices and customs, and training implemented, maintained, and still tolerated by Defendants were affirmatively linked to and were significantly influential force behind the injuries of Plaintiff.

167. By reason of the aforementioned policies, practices and customs, and training, Ms. Hayes suffered out-of-pocket expenses, loss of income, emotional distress, pain and suffering, fear, humiliation, and further damages according to

proof at the time of trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. For an order awarding, as appropriate, damages to Plaintiff:

(a) an award of compensatory damages;

(b) an award of punitive damages;

(c) an award of pre-judgment and post-judgment interest; and

(d) an award of attorneys' fees and costs.

## VII. JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims for which a jury may be provided.

Respectfully submitted,

Matt Stauffer

Matt Stauffer (AR 2012284)
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 W. Capitol Ave., Ste 3200
Little Rock, AR 72201
Work Cell: 501-830-9999
Email: mstauffer@bbpalaw.com

*Attorney for Plaintiff*